**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| VISHAL MEHTA, derivatively on behalf of LYFT, INC., | |
| Plaintiff, | C.A. No. _____ |
| vs. | |
| LOGAN GREEN, JOHN ZIMMER, BRIAN ROBERTS, PRASHANT (SEAN) AGGARWAL, BEN HOROWITZ, VALERIE JARRETT, DAVID LAWEE, HIROSHI MIKITANI, ANN MIURA-KO, MARY AGNES (MAGGIE) WILDEROTTER, and JONATHAN CHRISTODORO, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| LYFT, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Vishal Mehta ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Lyft, Inc. ("Lyft" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Logan Green ("Green"), John Zimmer ("Zimmer"), Brian Roberts ("Roberts"), Prashant (Sean) Aggarwal ("Aggarwal"), Ben Horowitz ("Horowitz"), Valerie Jarrett ("Jarrett"), David Lawee ("Lawee"), Hiroshi Mikitani ("Mikitani"), Ann Miura-Ko ("Miura-Ko"), Mary Agnes (Maggie) Wilderotter ("Wilderotter"), and Jonathan Christodoro ("Christodoro") (collectively, the "Individual Defendants," and together with Lyft, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of

1

Lyft, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lyft, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Lyft's current and/or former directors and officers from March 28, 2019 through the present (the "Relevant Period") based on false and misleading statements and omissions made in connection with the Company's March 28, 2019 initial public offering of stock ("the IPO"), and subsequent failures to correct them.

2.      Lyft develops, markets, and operates a mobile application, or "app" that offers vehicles for hire, motorized scooters, and a bicycle-sharing system. With 22.9 million active riders, Lyft is purportedly one of the largest and fastest-growing transportation networks in the United States and Canada, as well as the largest bike sharing platform in the United States.

3.      Lyft's revenue is substantially generated from charging its drivers service fees and commissions. Lyft also generates revenue from single-use ride fees and subscription fees paid by

bike riders to access the Company's fleet of shared bikes, which the Company added to its suite of services on November 30, 2018 through the acquisition of Bikeshare Holdings LLC ("Motivate"), the largest bikeshare operator in North America at that time.

4.      In December 2018, the Company's management began acting on plans to take the Company public. On December 12, 2018, before the beginning of the Relevant Period, the Company filed a draft registration statement on Form DRS with the SEC. Several months later, on March 1, 2019, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement") in connection with the planned IPO. The Registration Statement was declared effective on March 28, 2019, and the Company's stock began trading publicly on the Nasdaq Global Select Market ("NASDAQ-GS") the next day, March 29, 2019.

5.      Also on March 29, 2019, the Company filed with the SEC a Prospectus on Form 424B4 (the "Prospectus") in connection with the IPO. The Prospectus formed part of and was incorporated into the Registration Statement. The Prospectus, the Registration Statement, and all amendments thereto are collectively referred to herein as the "Offering Documents." Through the IPO, the Company sold over 32.5 million shares of stock priced at $72 per share, and received aggregate net proceeds of approximately $2.34 billion, after deducting underwriter costs and expenses.

6.      The Offering Documents touted Lyft's culture, values, brand, commitment to safety, and dedication to social responsibility—particularly in relation to women. The Offering Documents also touted Lyft's expansion as a multimodal platform and emphasized the importance of the Company's growth in alternative methods of transportation such as its newly acquired bike sharing program. Further, the Offering Documents advertised an overstated market share and flaunted certain revenue growth metrics as a critical measurement of the Company's financial

outlook. The Offering Documents also touted Lyft as "driver-centric' and highlighted key benefits that Lyft provided its drivers to offer an overall positive driver experience. Lastly, the Offering Documents detailed the risks facing the Company with respect to, among other things, illegal, improper, or otherwise inappropriate activity of the Company's proprietary network that *could* harm Lyft's business or adversely affect Lyft's operations.

7. However, these statements omitted a litany of serious issues with the Company's rideshare services that would have been highly material to investors, including: (1) passengers had already lodged many complaints with the Company and law enforcement officials regarding physical and sexual assault by Lyft drivers; (2) the Company's electric bikes suffered from a defective braking system that had resulted in rider injuries; (3) the Company's drivers had expressed discontent with certain of the Company's recent policy changes, and had threatened strikes and actually carried out strikes in order to boycott such changes; and (4) the possibility of litigation and reputational harm from the foregoing issues disrupting the Company's business was not a mere hypothetical, but a serious risk that had already materialized.

8. Further, the Offering Documents also omitted that Lyft had incurred a massive net loss for the first fiscal quarter of 2019, amounting to nearly triple analyst expectations even after adjusting for IPO-related payouts, and that the Company planned to discontinue providing investors with the same key metrics that it touted in the Offering Documents as vital to determining revenue growth.

9. Importantly—except for belatedly disclosing the Company's weak performance during the first fiscal quarter of 2019—the Individual Defendants failed to issue statements correcting the above-referenced material misstatements and omissions in the Offering Documents. Moreover, the Individual Defendants reiterated many of the false and misleading statements

contained in the Offering Documents in subsequent public statements disseminated after the IPO, including in the Company's quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"), and in the Company's associated earnings press release and conference call.

10.     The truth regarding the Company's actual market share emerged on April 1, 2019, when Guggenheim Partners released an analyst report calling into question Lyft's claimed 39% market share, and stating that a "Google Trends analysis comparing share of search volume across top ride-hail markets puts LYFT share at 24%."

11.     On this news, the price of the Company's stock fell approximately 11.9%, or $9.28, tumbling from $78.29 per share at the close of trading on March 29, 2019 to $69.01 per share at the close of trading on April 1, 2019.

12.     The truth regarding the extent of the Company's issues with Lyft drivers committing physical and sexual assault against passengers emerged more gradually during the Relevant Period, beginning about a week after the IPO on April 7, 2019. On that date, actress and writer Anna Gilchrist's ("Gilchrist") tweets recounting her story as a victim of sexual harassment while using Lyft went viral on Twitter, receiving over 15,000 retweets and 33,000 "likes." Shortly thereafter, on April 9, 2019, the San Francisco Chronicle ran a story covering Gilchrist's account.

13.     On this news, the price of the Company's stock fell approximately 5.67%, or $4.22, tumbling from $74.45 per share at the close of trading on April 5, 2019 to $70.23 per share at the close of trading on April 8, 2019. The Company's stock price continued to fall another 14.4% or $10.11 over the following two trading days, closing at $60.12 per share on April 10, 2019, which comprised a total three-day drop of nearly 19.25% or $14.33 per share.

14.     On April 14, 2019, after many riders sustained serious injuries resulting from a problem with the braking system used on the electric bikes contained in Lyft's network, Lyft removed about 3,000 electric bikes from service in its bike-share program in New York, Washington D.C., and San Francisco.

15.     On this news, the price of the Company's stock fell over 6.3%, or $3.79, dropping from $59.90 per share at the close of trading on the previous trading day, April 12, 2019, to $56.11 per share at the close of trading on April 15, 2019.

16.     A number of subsequent media articles and lawsuits revealed more details about the Company's issues with sexual assault, including: (1) on May 8, 2019, the *New York Post* reported that a sexual assault was committed by a Lyft driver in Illinois; (2) on July 4, 2019, the *Cincinnati Enquirer* reported that that a "Northern Kentucky man who was indicted on sexual abuse of a juvenile charges remained a Lyft driver for months after the allegations against him became public;" (3) on July 4, 2019, *San Mateo Daily Journal* reported that a 29-year old Lyft driver had been jailed on accusations he exposed himself to five preteen and teenage girls in four separate incidents in Daly City and Millbrae, California between March 2019 and May 2019; (4) on September 17, 2019, five woman filed lawsuits against Lyft, alleging in their suits that they had been sexually assaulted by their Lyft drivers and that the Company failed to adequately screen and perform diligent background checks on its drivers; and (5) on January 6, 2020, *USA Today* reported on a lawsuit filed in December 2018 by nineteen women against Lyft.

17.     On May 6, 2019, *The Verge* published an article (the "Verge Article") titled, "Uber and Lyft drivers are planning a strike on Wednesday ahead of Uber's IPO," in which it reported that "[l]abor groups organizing the strike are protesting the companies' payment and labor practices" and that, specifically, workers are demanding "fewer driver deactivations, an end to

upfront pricing, and a cap on the per-fare commission taken by ride-hail companies." The Verge Article also noted that "[t]he planned strikes appear to be more organized and geographically diverse than the protests that met Lyft's IPO in late March, which were mostly localized in California."

18.     On this news, the price of the Company's stock fell over 3.1%, or $1.94, dropping from $62.51 per share at the close of trading on the previous trading day May 3, 2019 to $60.57 per share at the close of trading on May 6, 2019.

19.     On May 7, 2019, the Company issued a press release announcing a colossal first quarter net loss, totaling over $1.1 billion, more than double the net loss the Company recognized during the prior fiscal year.

20.     The same day, the Company hosted a conference call for analysts and investors, during which Lyft's Chief Financial Officer ("CFO"), Defendant Roberts, disclosed that Lyft would no longer be providing investors with the "Bookings" metrics that the Company touted in the Offering Documents.

21.     On this news, the price of the Company's stock fell over 10.8%, or $6.43, dropping from $59.34 per share at the close of trading on May 7, 2019 to $52.91 per share at the close of trading on May 8, 2019.

22.     In total, from Lyft's IPO until May 8, 2019, the price per share of the Company's common stock plunged over 26.5%, or $19.09, from its IPO price of $72.00 per share to $52.91 per share. In response to the foregoing disclosures, the Company's stock price continued to dwindle throughout the following year, and as of the filing of this complaint, the Company's stock trades as low as $27.00 per share.

23.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) passengers who were verbally and physically assaulted, sexually harassed, and/or raped by Lyft drivers reported complaints with the Company about their experiences even prior to the IPO; (2) it was highly probable that the Company would suffer reputational damage and/or legal liability due to the rampant and increasing amount of sexual assaults committed by Lyft drivers; (3) the braking system on Lyft's electronic bikes was defective and riders sustained injuries such as scrapes, bruising, broken bones, and damaged limbs; (4) riders who were injured as a result of defect in the braking system in Lyft's electric bikes lodged complaints with the Company about their accidents even prior to the IPO; (5) safety issues related to the Company's electric bike fleet stifled Lyft's expansion, diversification, and transformation into a multimodal transportation network; (6) labor disputes with Lyft's drivers, resulting from the Company's policy changes leading up to the IPO, threatened to disrupt Lyft's workforce and significantly impact its business; (7) the Company had suffered a colossal first quarter net loss, totaling over $1.1 billion, more than double the net loss the Company recognized the fiscal year prior; (8) the Company planned to abandon key revenue growth metrics that the Company touted in its Offering Documents as important measurements of Lyft's financial performance and growth; (9) the Company's market share was overstated; and (10) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

24.     After the IPO, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

25.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

26.     In light of the Individual Defendants' misconduct, which has subjected the Company, its Chief Executive Officer ("CEO"), President, its CFO, seven members and two former members of its Board of Directors (the "Board") and the underwriters of the IPO to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Federal Securities Class Action"), and a state securities class action lawsuit pending in the Superior Court of the State of California (the "State Securities Class Action", and together with the Federal Securities Class Action, the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

27.     In the Federal Securities Class Action, on September 8, 2020, District Judge Haywood S. Gilliam, Jr. ("Gilliam") granted in part and denied in part Defendants Lyft, Green, Zimmer, Aggarwal, Horowitz, Jarrett, Lawee, Mikitani, Miura-Ko, Wilderotter and Christodoro's motion to dismiss. Specifically, Judge Gilliam found that Defendants' statements and omissions related to whether the Company's omission of any mention of potential liability from sexual assaults perpetrated by drivers against riders made Lyft's, and the statements and omissions

concerning Risk Factors Lyft listed in connection to the defects in thousands of bikes included in the Company's bikeshare program constituted material misstatements or omissions, and thus held that a claim for securities fraud had been stated against Lyft and certain of the Company's officers and directors. Securities Class Action Order at 9-10; 18, *In Re Lyft Inc. Securities Litigation*, Docket No. 4:19-cv-02690-HSG, (N.D. Cal. Sept. 8, 2020) ("Federal Securities Class Action Order").

28.     Moreover, with respect to the sexual assault complaints and litigation at the time of the IPO, and the "'pervasive' nature of the problem and the limited information available to the public," Judge Gilliam found that "[d]efendants do not show that the underlying information allegedly omitted (including individual complaints and litigation) was specifically disclosed to the public" and that "[p]laintiff's allegation is that the Registration Statement failed to warn of reputational risk due to the sexual assault allegations and litigation and that such reputational risk had already materialized by the time of Lyft's IPO." Therefore Judge Gilliam held that "[p]laintiff's allegations as to the related risk factor statements sufficiently lead a Section 11 action." *Id.* at 10-11.

29.     Finally, with respect to the statements pertaining to the risk factors disclosed in connection to Lyft's bikeshare program, Judge Gilliam held that those "allegations sufficiently state a claim under Section 11" because "[p]laintiff alleges that the Registration Statement's hypothetical risks were in fact 'present realities,' and that 'Lyft's fleet of bikes were already experiencing dangerous defects and were being improperly repaired.'"

30.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class

Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

32.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions.

33.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

34.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

35.     Venue is proper in this District because Lyft is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

36.     Plaintiff is a current shareholder of Lyft. Plaintiff has continuously held Lyft common stock at all relevant times.

### Nominal Defendant Lyft

37.     Lyft is a Delaware corporation with its principal executive offices at 185 Berry Street, Suite 5000, San Francisco, California 94107. Lyft's shares trade on the NASDAQ-GS under the ticker symbol "LYFT."

**Defendant Green**

38.     Defendant Green co-founded Lyft in 2007, and has served as Lyft's CEO and as a Company director since 2007. According to the Company's Schedule 14A filed with the SEC on April 27, 2020 (the "2020 Proxy Statement"), as of March 31, 2020, Defendant Green beneficially owned 816,347 shares of the Company's Class A stock and 5,642,102 shares of the Company's Class B stock, which represented 64.1% of the Company's outstanding Class B stock as of that date.[1]   Therefore, as of March 31, 2020, Defendant Green beneficially owned 6,458,449 shares of the Company's Class A and B stock, which represented approximately 23.97% of total voting power, as of that date. Given that the price per share of the Company's Class A stock at the close of trading on March 31, 2020 was $26.85, Defendant Green owned nearly $173.41 million worth of Lyft Class A and B stock.[2]

---

[1] Each share of Class A common stock entitles its holder to one vote. Each share of Class B common stock entitles its holder to 20 votes, and is convertible at any time into one share of Class A common stock on a share-for-share basis, such that each holder of Class B common stock beneficially owns an equivalent number of shares of Class A common stock.

[2] The 2020 Proxy Statement stated the following with respect to Defendant Green's Class A and B Stock ownership: "Consists of (i) 738,597 shares of Class A common stock held by Mr. Green, (ii) 1,627,851 shares of Class B common stock held by Mr. Green, (iii) 2,776,707 shares of Class B common stock held by El Trust dated August 3, 2015, for which Mr. Green serves as trustee, (iv) 1,237,544 shares of Class B common stock held by The Green 2014 Irrevocable Trust dated June 12, 2014, for which Mr. Zimmer serves as trustee and (v) 77,750 shares of Class A common stock issuable to Mr. Green upon the vesting of restricted stock units within 60 days of March 31, 2020."

39.     For the fiscal year ended December 31, 2019, Defendant Green received $801,564 in compensation from the Company. This included $441,346 in salary and $360,218 in all other compensation.

40.     The 2020 Proxy Statement stated the following about Defendant Green:

***Logan Green.*** Mr. Green is a co-founder of Lyft and has served as our Chief Executive Officer and as a member of our board of directors since our founding. Prior to co-founding Lyft, Mr. Green created the first car-share program at the University of California, Santa Barbara and served on the Board of the Santa Barbara Metropolitan Transit District. Mr. Green currently serves as a member of the board of directors of eBay Inc., an online marketplace and payments company. Mr. Green holds a B.A. in Business Economics from the University of California, Santa Barbara.

Mr. Green was selected to serve on our board of directors because of the perspective and experience he brings as our Chief Executive Officer and as a co-founder.

## Defendant Zimmer

41.     Defendant Zimmer co-founded Lyft in 2007, and has served as Lyft's President since March 2013 and as Lyft's Vice Chairman since January 2019. He has also served as a Company director since June 2010. Previously, he served as the Company's Chief Operating Officer ("COO") from July 2008 until March 2013. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Zimmer beneficially owned 816,296 shares of the Company's Class A stock and 3,160,527 shares of the Company's Class B stock, which represented 35.9% of the Company's outstanding Class B stock as of that date. Therefore, as of March 31, 2020, Defendant Zimmer beneficially owned 3,976,823 shares of the Company's Class A and B stock, which represented approximately 13.5% of total voting power, as of that date. Given that the price per share of the Company's Class A stock at the close of trading on March 31, 2020 was $26.85, Defendant Green owned nearly $106.8 million worth of Lyft Class A and B stock.

42.     For the fiscal year ended December 31, 2019, Defendant Zimmer received $2,012,450 in compensation from the Company. This included $441,346 in salary and $1,571,104 in all other compensation.

43.     The 2020 Proxy Statement stated the following about Defendant Zimmer:

**John Zimmer.** Mr. Zimmer is a co-founder of Lyft and has served as our President since March 2013, our Vice Chairman since January 2019 and as a member of our board of directors since June 2010, and previously served as our Chief Operating Officer from July 2008 until March 2013. Prior to co-founding Lyft, Mr. Zimmer served as an analyst in real estate finance at Lehman Brothers Holdings Inc., which was a global financial services firm. Mr. Zimmer holds a B.S. in Hotel Administration from Cornell University.

Mr. Zimmer was selected to serve on our board of directors because of the perspective and experience he brings as our President and as a co-founder.

### **Defendant Roberts**

44.     Defendant Roberts has served as the Company's CFO since November 2014. Previously, he served as the Company's Senior Vice President of Partnerships and Corporate Development from October 2014 to November 2014. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Roberts beneficially owned 968,281 shares of the Company's Class A stock. Given that the price per share of the Company's Class A stock at the close of trading on March 31, 2020 was $26.85, Defendant Roberts owned nearly $26 million worth of Lyft Class A stock.

45.     For the fiscal year ended December 31, 2019, Defendant Roberts received $9,567,634 in compensation from the Company. This included $441,346 in fees earned or cash paid, $9,123,624 in stock awards, and $2,664 in all other compensation.

46.     The 2020 Proxy Statement stated the following about Defendant Roberts:

**Brian Roberts.** Mr. Roberts has served as our Chief Financial Officer since November 2014, and previously served as our Senior Vice President, Partnerships and Corporate Development from October 2014 to November 2014. From May 2011 to October 2014, Mr. Roberts served as Senior Vice President in Business

14

Development and Strategy at Walmart Global eCommerce, a division of Walmart Inc., a retail company. Prior to Walmart, Mr. Roberts served as Senior Managing Director at Evercore Inc., an investment banking advisory firm, led the corporate development organizations at Microsoft Corporation, a software company, and Inktomi Corp., a software company, and served as Vice President at Lazard Frères & Co. LLC, an investment banking advisory firm. Mr. Roberts serves as a member of the board of trustees at The Fred Hutchinson Cancer Research Center. Mr. Roberts holds a B.A. in Economics from the University of California, Berkeley and an M.B.A. from Harvard Business School.

**Defendant Aggarwal**

47.     Defendant Aggarwal has served as the Company's Chairman of the Board since January 2019 and as a Company director since February 2016. He also serves as a member of the Audit Committee and Compensation Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Aggarwal beneficially owned 1,411,402 shares of the Company's Class A stock. Given that the price per share of the Company's Class A stock at the close of trading on March 31, 2020 was $26.85, Defendant Aggarwal owned nearly $37.9 million worth of Lyft Class A stock.

48.     For the fiscal year ended December 31, 2019, Defendant Aggarwal received $342,560 in compensation from the Company. This included $82,581 in fees earned or cash paid and $259,979 in stock awards.

49.     The 2020 Proxy Statement stated the following about Defendant Aggarwal:

***Sean Aggarwal.*** Mr. Aggarwal has served as our Board Chair since January 2019 and as a member of our board of directors since February 2016. Since March 2016, Mr. Aggarwal has served as the Chief Executive Officer of Soar Capital, LLC, where he focuses on investments in early-stage technology companies. From November 2011 to February 2015, Mr. Aggarwal served as the Chief Financial Officer at Trulia, Inc., an online real estate company. From June 2008 to October 2011, Mr. Aggarwal served as the Vice President of Finance at PayPal Holdings, Inc., an online payments company. From March 2003 to May 2008, Mr. Aggarwal worked at eBay Inc. in various finance roles including as Vice President of Finance. Prior to eBay Inc., Mr. Aggarwal served as Director of Finance at Amazon.com, Inc., an e-commerce company. Mr. Aggarwal started his career in investment banking with Merrill Lynch, Pierce, Fenner & Smith Incorporated, a financial

services company. Mr. Aggarwal currently serves as a member of the board of directors of Arlo Technologies, Inc., a home security company, and Yatra Online, Inc., an online travel company. Mr. Aggarwal holds a B.A. in Economics from the College of Wooster and a Master of Management in Finance and Marketing from Northwestern University, Kellogg School of Management.

Mr. Aggarwal was selected to serve on our board of directors because of his significant operational experience as an executive with technology companies, and his deep understanding of finance, financial reporting, strategy, operations and risk management.

### **Defendant Horowitz**

50.     Defendant Horowitz served as a Company director from June 2016 until June 2020. He also served as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Horowitz beneficially owned 12,873,987 shares of the Company's Class A stock, which represented 4.32% of the Company's outstanding Class A stock as of that date. Given that the price per share of the Company's Class A stock at the close of trading on March 31, 2020 was $26.85, Defendant Horowitz owned nearly $345.7 million worth of Lyft Class A stock.

51.     For the fiscal year ended December 31, 2019, Defendant Horowitz received $296,893 in compensation from the Company. This included $36,914 in fees earned or cash paid and $259,979 in stock awards.

52.     The 2020 Proxy Statement stated the following about Defendant Horowitz:

***Ben Horowitz.*** Mr. Horowitz has served as a member of our board of directors since June 2016. Mr. Horowitz is a co-founder and has served as a General Partner of Andreessen Horowitz, a venture capital firm, since July 2009. From September 2007 to October 2008, Mr. Horowitz served as a Vice President and General Manager of Hewlett-Packard Company, an information technology company. From September 1999 to September 2007, Mr. Horowitz served as the co-founder, President and Chief Executive Officer of Opsware Inc., a computer software company. Mr. Horowitz currently serves on the boards of directors of Okta, Inc., a software company, and several privately-held companies. Mr. Horowitz holds a B.A. in Computer Science from Columbia University and a M.S. in Computer Science from the University of California, Los Angeles.

Mr. Horowitz was selected to serve on our board of directors because of his extensive operating and management experience, his knowledge of technology companies and his extensive experience as a venture capital investor.

**Defendant Jarrett**

53.     Defendant Jarrett has served as a Company director since July 2017. She also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Jarrett beneficially owned 20,393 shares of the Company's Class A stock. Given that the price per share of the Company's Class A stock at the close of trading on March 31, 2020 was $26.85, Defendant Jarrett owned approximately $547,552 worth of Lyft Class A stock.

54.     For the fiscal year ended December 31, 2019, Defendant Jarrett received $301,840 in compensation from the Company. This included $41,861 in fees earned or cash paid and $259,979 in stock awards.

55.     The 2020 Proxy Statement stated the following about Defendant Jarrett:

***Valerie Jarrett.*** Ms. Jarrett has served as a member of our board of directors since July 2017. Ms. Jarrett has served as a Senior Advisor to the Obama Foundation since April 2017 and a Distinguished Senior Fellow at the University of Chicago Law School since January 2018. From January 2008 to January 2016, Ms. Jarrett served as Senior Advisor to the President of the United States, where she oversaw the Office of Public Engagement and Intergovernmental Affairs and chaired the White House Council on Women and Girls. Prior to joining the administration of the President of the United States, Ms. Jarrett served in various senior positions, including Chief Executive Officer of the Habitat Company, a Chicago real estate development and management firm. She previously was Deputy Chief of Staff for the Mayor of Chicago, served as Commissioner of the Chicago Department of Planning and Development and chaired the Chicago Transit Board. Ms. Jarrett currently serves as Chairperson of the board of directors of When We All Vote, a non-profit organization, and serves on the boards of directors of 2U, Inc., an education technology company, and Ariel Investments, LLC, a private investment company. Ms. Jarrett holds a B.A. from Stanford University and a J.D. from the University of Michigan Law School.

Ms. Jarrett was selected to serve on our board of directors because of her broad experience in public policy.

**Defendant Lawee**

56.     Defendant Lawee has served as a Company director since November 2017. He also serves as the Chairperson of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Lawee beneficially owned 12,584,332 shares of the Company's Class A stock, which represented 4.22% of the Company's outstanding Class A stock as of that date. Given that the price per share of the Company's Class A stock at the close of trading on March 31, 2020 was $26.85, Defendant Lawee owned nearly $337.9 million worth of Lyft Class A stock.

57.     For the fiscal year ended December 31, 2019, Defendant Lawee received $309,451 in compensation from the Company. This included $49,472 in fees earned or cash paid and $259,979 in stock awards.

58.     The 2020 Proxy Statement stated the following about Defendant Lawee:

*David Lawee.* Mr. Lawee has served as a member of our board of directors since November 2017. Mr. Lawee has served as the Founder and Managing Partner of CapitalG, a growth equity fund backed by Alphabet Inc., the parent company of Google LLC, or Google, a global technology company, since January 2013. Prior to CapitalG, Mr. Lawee served as Google's Vice President, Marketing and later as Google's Vice President, Corporate Development. Prior to joining Google, Mr. Lawee co-founded numerous companies, including Xfire, Inc., an online gaming company which was acquired by Viacom Inc., and Mosaic Venture Partners, a venture capital firm. Mr. Lawee currently serves on the boards of directors of a number of privately held companies. Mr. Lawee holds a B.A. in Philosophy from the University of Western Ontario, an M.B.A from the University of Chicago and a B.C.L. from McGill University.

Mr. Lawee was selected to serve on our board of directors because of his extensive experience in the venture capital industry and his knowledge of technology companies.

**Defendant Mikitani**

59.     Defendant Mikitani served as a Company director from March 2015 until he resigned on August 31, 2020. According to the 2020 Proxy Statement, as of March 31, 2020,

Defendant Mikitani beneficially owned 31,400,156 shares of the Company's Class A stock, which represented 10.54% of the Company's outstanding Class A stock as of that date. Given that the price per share of the Company's Class A stock at the close of trading on March 31, 2020 was $26.85, Defendant Mikitani owned nearly $843.1 million worth of Lyft Class A stock.

60.     For the fiscal year ended December 31, 2019, Defendant Mikitani received $290,423 in compensation from the Company. This included $30,444 in fees earned or cash paid and $259,979 in stock awards.

61.     The 2020 Proxy Statement stated the following about Defendant Mikitani:

*Hiroshi Mikitani.* Mr. Mikitani has served as a member of our board of directors since March 2015. Mr. Mikitani is the founder, Chairman and Chief Executive Officer of Rakuten, Inc., one of the world's leading Internet service companies. Mr. Mikitani currently serves on the boards of directors of a number of privately held companies. Mr. Mikitani holds a commerce degree from Hitotsubashi University and an M.B.A. from Harvard Business School.

Mr. Mikitani was selected to serve on our board of directors because of his extensive operating and management experience with major technology companies.

**Defendant Miura-Ko**

62.     Defendant Miura-Ko has served as a Company director since June 2016, and previously served as a Company director from June 2010 until May 2013. She also serves as the Chairperson of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Miura-Ko beneficially owned 47,005 shares of the Company's Class A stock. Given that the price per share of the Company's Class A stock at the close of trading on March 31, 2020 was $26.85, Defendant Miura-Ko owned over $1.2 million worth of Lyft Class A stock.

63.     For the fiscal year ended December 31, 2019, Defendant Miura-Ko received $298,423 in compensation from the Company. This included $38,817 in fees earned or cash paid

and $259,979 in stock awards.

64. The 2020 Proxy Statement stated the following about Defendant Miura-Ko:

***Ann Miura-Ko.*** Dr. Miura-Ko served as a member of our board of directors from June 2010 to May 2013 and has rejoined and served as a member of our board of directors since June 2016. Dr. Miura-Ko co-founded and has served as a Partner at Floodgate Fund, LP, a venture capital firm, since May 2008. Dr. Miura-Ko currently serves on the boards of directors of a number of privately-held companies. Dr. Miura-Ko holds a B.S. in Electrical Engineering from Yale University and a Ph.D. in Quantitative Modeling of Computer Security from Stanford University.

Dr. Miura-Ko was selected to serve on our board of directors because of her extensive experience in the venture capital industry, technical expertise and knowledge of technology companies.

**Defendant Wilderotter**

65. Defendant Wilderotter has served as a Company director since May 2018. She also serves as the Chairperson of the Audit Committee. According to the 2020 Proxy Statement, as of March 31, 2020, Defendant Wilderotter beneficially owned 9,243 shares of the Company's Class A stock. Given that the price per share of the Company's Class A stock at the close of trading on March 31, 2020 was $26.85, Defendant Wilderotter owned approximately $248,174 worth of Lyft Class A stock.

66. For the fiscal year ended December 31, 2019, Defendant Wilderotter received $309,451 in compensation from the Company. This included $49,472 in fees earned or cash paid, $259,979 in stock awards.

67. The 2020 Proxy Statement stated the following about Defendant Wilderotter:

***Maggie Wilderotter.*** Ms. Wilderotter has served as a member of our board of directors since May 2018. Ms. Wilderotter has served as the Chief Executive Officer and Chairman of the Grand Reserve Inn, a luxury resort and vineyard, since August 2016. From November 2004 to April 2016, Ms. Wilderotter served in a number of roles at Frontier Communications Corporation, a public telecommunications company, including as Executive Chairman of the board of directors from April 2015 to April 2016, Chairman and Chief Executive Officer from January 2006 to April 2015, and President, Chief Executive Officer and a

director from 2004 to 2006. Ms. Wilderotter currently serves on the board of directors of Costco Wholesale Corporation, a wholesale retailer, Hewlett Packard Enterprise Company, an enterprise information technology company, and DocuSign, Inc., a digital transaction management services company. Ms. Wilderotter has served on many corporate boards, and in the past five years, was a director of Cadence Design Systems, Inc., an electronic design automation software and engineering services company, through April 2020, Xerox Corporation, a document management solutions company, DreamWorks Animation SKG, Inc., an entertainment company, Juno Therapeutics, Inc., a biopharmaceutical company, and The Procter & Gamble Company, a consumer goods company. Ms. Wilderotter holds a B.A. in Economics from the College of the Holy Cross.

Ms. Wilderotter was selected to serve on our board of directors because of her significant public company leadership experience as a board member and an officer, as well as her experience in senior leadership positions in the areas of marketing and technology.

### Defendant Christodoro

68.     Defendant Christodoro served as a Company director from May 2015 until he resigned from the Board in March 2019. He also served as a member of the Compensation Committee.

69.     The Registration Statement stated the following about Defendant Christodoro:

*Jonathan Christodoro.* Mr. Christodoro has served as a member of our board of directors since May 2015. From July 2012 to February 2017, Mr. Christodoro served as Managing Director of Icahn Capital LP, a private investment firm. Prior to joining Icahn Capital LP, Mr. Christodoro served in various investment and research roles at P2 Capital Partners, LLC, Prentice Capital Management, LP and S.A.C. Capital Advisors, LP, each a private investment firm. Mr. Christodoro began his career as an investment banking analyst at Morgan Stanley & Co., an investment banking company, where he focused on merger and acquisition transactions across a variety of industries. Mr. Christodoro currently serves on the boards of directors of PayPal Holdings, Inc., Herbalife Nutrition Ltd., a nutrition company, Enzon Pharmaceuticals, Inc., a pharmaceutical company, SandRidge Energy, Inc., an oil and gas company, and Xerox Corporation, a document management solutions company. Mr. Christodoro was previously a director of eBay Inc., Cheniere Energy, Inc., a developer of natural gas liquefaction and export facilities and related pipelines, American Railcar Industries, Inc., a railcar manufacturing company, Hologic, Inc., a medical devices company, and Talisman Energy Inc., an oil and gas exploration and production company. Mr. Christodoro holds a B.S. in Applied Economics and Management from Cornell University and an M.B.A. from The Wharton School of the University of Pennsylvania.

Mr. Christodoro was selected to serve on our board of directors because of his experience in financial and operational oversight as a result of his service on the boards of directors of numerous other companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

70.     By reason of their positions as officers, directors, and/or fiduciaries of Lyft and because of their ability to control the business and corporate affairs of Lyft, the Individual Defendants owed Lyft and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Lyft in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Lyft and its shareholders so as to benefit all shareholders equally.

71.     Each director and officer of the Company owes to Lyft and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

72.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lyft, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

73.     To discharge their duties, the officers and directors of Lyft were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

74.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lyft, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Lyft's Board at all relevant times.

75.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 and traded on the NASDAQ-GS, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

76.     To discharge their duties, the officers and directors of Lyft were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Lyft were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and

pursuant to Lyft's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Lyft conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Lyft and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Lyft's operations would comply with all applicable laws and Lyft's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

24

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

77.     Each of the Individual Defendants further owed to Lyft and the shareholders the duty of loyalty requiring that each favor Lyft's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

78.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Lyft and were at all times acting within the course and scope of such agency.

79.     Because of their advisory, executive, managerial, and directorial positions with Lyft, each of the Individual Defendants had access to adverse, non-public information about the Company.

80.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lyft.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

82.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning

the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

83.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Lyft was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

84.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

85.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lyft and was at all times acting within the course and scope of such agency.

## LYFT'S CODE OF CONDUCT

86.     The Company's Code of Conduct provides that it "applies to all directors, officers and team members." The Code of Conduct also maintains that, "[t]hese are common-sense policies, many of which are either required by law or intended to help the company comply with

the law, so we expect you to follow them. You could face disciplinary action if you don't, including

termination of employment."

87.     In a section titled, "Purpose," the Code of Conduct provides, in relevant part:

This Code is intended to ensure and promote:

1.  a culture of honest and accountability;

2.  honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest;

3.  fair and accurate books and records, including financial reporting;

4.  ethical conduct and compliance with applicable laws, rules and regulations including, without limitation, full, fair, accurate, timely and understandable disclosure in reports and documents we file with or submit to the Securities and Exchange Commission and in our other public documents;

5.  the prompt internal reporting of this Code, as set forth in this Code; and

6.  the deterrence of wrongdoing.

This Code is a guide, and the company expects team members to use their own judgment at all times to follow the high ethical standards to which the company is committed.

88.     In a section titled, "Conflicts of Interest," the Code of Conduct states the following:

A conflict of interest is any activity or interest that is inconsistent with or opposed to the best interests of the company. Your decision and actions in the course of employment or other relationship with the company should be based on the best interests of the company and not based on personal relationships or benefits. You must never use or attempt to use your position with the company to obtain improper personal benefits. Any situation, transaction or relationship that may give rise to an actual or potential conf and shall be avoided, unless approved by the company.

89.     In a section titled, "Fair Dealing," the Code of Conduct states the following:

The company has a history of succeeding through honest business competition. The company does not seek competitive advantages through illegal or unethical business practices. You should endeavor to deal fairly with each other and with the company's users, drivers, customers, service providers, suppliers, business partners and competitors. No team member should take unfair advantage of anyone through

27

manipulation, concealment abuse of privileged information, misrepresentation of material facts or any unfair dealing practice.

90.     In a section titled, "Financial Reports and Other Records," the Code of Conduct

states the following:

> Team members are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to senior management of financial and non-financial information that may be material to the company. The company expects all of its team members to take this responsibility very seriously to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the company files with government agencies or releases to the general public.
>
> Each team member, to the extent involved in the company's disclosure process, including without limitation, the principal executive officer, principal financial officer and other senior team members who perform similar functions in the company (collectively, "Senior Financial Officers"), must familiarize themselves with the disclosure requirements applicable to the company as well as the business and financial operations of the company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the company to others, whether within or outside the company, including to the company's independent auditors, governmental regulators and self-regulatory organizations.
>
> All of the company's books, records, accounts and financial statements must be maintained in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely. Furthermore, all books, records, accounts and financial statements must conform both to applicable legal requirements and to the company's system of internal controls. All assets of the company must be carefully and properly accounted for. No undisclosed or unrecorded account or fund will be established for any purpose. No false or misleading entries will be made in the company's books or records for any reason, and no disbursement of corporate funds or other corporate property will be made without adequate supporting documentation and authorization. Misclassification of transactions as to accounts, business units or accounting periods is forbidden. Each team member bears responsibility for ensuring that they are not party to a false or misleading accounting entry. This means we cannot make any promises that are not detailed in the documentation that has been fully reviewed by the appropriate departments. Failure to be transparent and to follow the correct approval and documentation process can cause problems for you and the company.

91.     In a section titled, "Communications," the Code of Conduct states the following, in

relevant part:

Clear and consistent communication is important for Lyft. We need to make careful decisions about what to say—and how—to the media and public. All statements we make to the public should be complete, accurate and truthful, never false or misleading. Our entire community -- team members, drivers, riders, investors and other stakeholders -- deserve honesty, transparency and consistency from us…

92.    In a section titled, "Compliance with Laws, Rules & Regulations" the Code of Conduct states that employees are expected to "respect and obey all laws when carrying out responsibilities on behalf of the company and refrain from illegal conduct." The Code of Conduct also provides that employees have "an obligation to be knowledgeable about specific laws, rules and regulations that apply to your area of responsibility" and counsels that "[i]f a law conflicts with a policy in this Code, you must comply with the law."

93.    Further, in the section titled, "Compliance with Laws, Rules & Regulations," the Code of Conduct provides, in relevant part:

Health, Safety & Environment

The company works to conduct its business activities and operations in a manner that promotes protection of people and the environment to the extent practicable. Compliance with all applicable laws, rules and regulations governing health, safety and the environment are a responsibility of management and team members in all functions.

94.    In a section titled, "Compliance & Reporting," the Code of Conduct states the following, in relevant part:

Reporting Violations

If you know of or suspect a violation of this Code, or of applicable laws and regulations (including complaints or concerns about accounting, internal accounting controls or auditing matters), or you have concern about a situation that you believe does not reflect our culture and values, you should voice your concerns to your manager or a member of the internal audit team, People Team or Legal Team. **You may also report concerns anonymously via our confidential independent Reporting Hotline, Ethical Advocate (https://reports.ethicaladvocate.com/). Please see the Whistleblower Policy for information about making anonymous reports.**

> All reports will be kept confidential, to the extent practical, except where disclosure
> is required to mandated by law. The company does not permit retaliation of any
> kind for good faith reports of violations or possible violations.

(Emphasis in original.)

95.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, and aiding and abetting thereof. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

96.     Lyft is a San Francisco, California-based peer-to-peer ridesharing company originally founded as in 2007 as Bounder Web, Inc., a carpool matching service for universities and companies. In 2008, the Company changed its name to Zimride, Inc. ("Zimride") before eventually launching its current ideation as an on-demand peer-to-peer ridesharing platform in 2012.  In 2013, the Company sold its assets related to its early "Zimride operations," and changed its name to Lyft.

97.     Today, Lyft touts itself as one of the largest and fastest growing transportation networks in the United States and Canada, with 22.9 million active riders, second only to Uber

Technologies, Inc. ("Uber").[2] The Company also purports to be the largest bike sharing platform in the United States.

98.    Lyft develops, markets, and operates a mobile app offering vehicles for hire, motorized scooters, and a bicycle-sharing system. To gain access to the Company's transportation network, Lyft users must first download the app and create a profile. Lyft connects drivers with riders to facilitate the completion of a successful transportation service for riders, at which time a cashless payment from the rider to the driver is made. Lyft driver earnings are primarily based on the time and distance of the ride. Lyft's revenue is substantially generated from charging its drivers service fees and commissions, which vary based on the price of the ride, for using the Company's rideshare marketplace to connect with riders.

99.    Lyft also generates revenue from single-use ride fees or subscription fees paid by bike riders to access the Company's fleet of shared bikes, which it added to its suite of services on November 30, 2018 through the acquisition of Motivate, the largest bikeshare operator in North America at the time. To that end, Motivate generated approximately $100 million in revenue in 2017 and accounted for about 80% of bike-share trips in the United States. Moreover, Motivate had expanded its bikeshare system through exclusive contracts in many of the major cities in the country including New York, San Francisco, Chicago, Boston, Washington D.C., Portland, Columbus, and Minneapolis. Between April and September 2018, Motivate had rolled out a fleet of electric bikes in a select few cities across the country.

---

[2] Uber, founded in 2009, is the world largest ride share company and operates as a multinational transportation network company offering many of the same services as Lyft, including peer-to-peer ridesharing, ride service hailing, and, since, its April 2018 acquisition of Social Bicycles, Inc. ("Jump"), a bike-sharing system. Uber also provides users with food delivery and freight shipping services. As such, Uber is currently and historically, Lyft's largest and most formidable competitor. Uber went public shortly after Lyft with an initial public offering on or about May 9, 2019.

100.    In connection with its acquisition of Motivate, Lyft committed to investing $100 million in the bike-sharing system for the New York metro area[4] in the next five years, and also assumed certain pre-existing contractual obligations to increase the bike fleets in other locations.

101.    Appropriately, the Company has continually characterized its acquisition of Motivate as a critical part of the young company's expansion and development. In a blog post announcing the acquisition, the Company stated that "[t]ogether Lyft and Motivate will revolutionize urban transportation and put bike-share systems across the country on a path toward growth and innovation." Lyft also committed to "invest[ing] to establish bike offerings in our major markets and pursue growth and innovation in the markets where Motivate currently operates."

### *Passenger Reports of Sexual Assault Perpetrated by Lyft Drivers Prior to the IPO*

102.    Since well before the IPO—and as the Individual Defendants were aware—Lyft has had a serious, widespread problem with sexual assaults committed by its drivers. After the IPO, many news articles were published shedding light on Lyft's sexual assault problem with its drivers, and ultimately, many victims filed lawsuits, including class actions against the Company to hold it responsible for its lack of diligence and dereliction of duty to take action to prevent its drivers from sexually assaulting their passenger-clientele. Instead of addressing the problem by, for example, imposing rigorous behavioral policies and procedures and mandating extensive sexual harassment training, the Individual Defendants did nothing of the sort, fearing that taking such measures would provide credence to plaintiff-driver arguments that had contended that drivers should be classified as "employees" instead of "independent contractors," which would

---

[4] Upon Lyft's completion of the Motivate acquisition, New York City Mayor, Bill de Blasio announced that New York City and Lyft intended to triple the size of New York City's Citi Bike fleet.

cause the Company to take on certain legal and financial obligations. Moreover, at the time of the IPO, Lyft's interface lacked certain fundamental and necessary safety features such as a panic or emergency button. Finally, at the time of the IPO, Lyft's background check policy was woefully deficient since it had not yet instituted a "continuous background check" policy to properly vet its drivers.[5]

103.    Below is a non-exhaustive list of instances of sexual assault and safety incidents that the Individual Defendants were aware of—and many of which, the public was unaware of[3]—at the time the Company issued the Offering Documents. This list is organized in chronological order from the date of the incident and demonstrates exactly how extensive Lyft's safety issues were before the IPO:

| DATE | DESCRIPTION OF INCIDENT |
| --- | --- |
| January 28, 2015 | Yiqing Chen's Lyft driver took her to Baldwin Park, California instead of her intended destination and sexually assaulted her. Chen filed a lawsuit against Lyft in January 2017 for assault, battery, false imprisonment, common carrier negligent hiring and retention of unfit employees, intentional infliction of emotional distress, and negligent infliction of emotional distress.[4] |
| March 2015 | In Seattle, Washington, Lyft and Uber driver Dereje Y. Kebede attempted to rape a woman while driving under the Uber platform. He was later charged with attempted rape.[5] |
| May 26, 2015 | Lyft driver raped a woman, identified as Alyssa Doe in her complaint at her hotel room. The woman filed suit in May 2018.[6] |

---

[5] Uber adopted a similar policy as early as 2018.

[3] https://sfpublicpress.org/california-agency-is-hiding-uber-and-lyft-accident-reports/. Last visited September 24, 2020.

[4] *Chen v. Lyft, Inc., et al.*, Case No. BC647472 (Super. Ct. Los Angeles County), filed January 18, 2017.

[5] https://komonews.com/news/local/charge-uber-driver-tried-to-rape-seattle-area-passenger. Last visited September 24, 2020.

[6] https://www.nbclosangeles.com/news/passenger-sues-lyft-over-alleged-sexual-assault/152866/. Last visited September 24, 2020.

| May 30, 2015 | In Seattle, Washington, a Lyft driver demanded sex from a female passenger in exchange for returning her lost phone. Upon reaching into the vehicle to retrieve her phone, the driver dragged her down the street. After a law enforcement investigation, Lyft deactivated the driver.[7] |
| --- | --- |
| September 5, 2015 | A Lyft driver followed a female passenger into her home, who groped her and requested that she perform a sex act. The Chula Vista, California police department began a criminal investigation with Lyft's cooperation. The victim filed suit against Lyft in October 2015 alleging Lyft failed to perform the requisite diligence to protect her, despite the Trust and Safety Fee she was charged.[8] |
| January 27, 2016 | After her Lyft driver sexually assaulted her, a woman filed suit against Lyft seeking damages. The driver was also charged with misdemeanor battery for groping her. |
| April 30, 2016 | After falling asleep in her Lyft driver's vehicle in or near North Hollywood, California, Candie Fernandez was sexually assaulted by her Lyft driver. Fernandez filed suit against Lyft in May 2018.[9] |
| June 2016 | A Lyft driver sexually assaulted and threatened an unnamed woman in Chicago, Illinois. The incident was reported to authorities, and later referenced in a complaint filed in July 2018 against Lyft related to a separate assault incident. |
| September 22, 2016 | Jeremy Vague's arrest for sexually assaulting multiple women while driving for both Lyft and Uber in Southern California was reported.[10] |
| October 8, 2016 | A Lyft driver raped a woman while she was unconscious in San Diego, California until two of the woman's friends witnessed and then put a stop to the rape. The woman reported the incident to police "immediately" and Lyft was also notified. The woman filed suit in August 2019. |
| December 9, 2016 | A Lyft driver raped a woman in San Diego, California. The woman reported the assault to law enforcement and to Lyft. However, Lyft permitted the driver to continue driving for Lyft. The woman filed suit in August 2017. |
| March 20, 2017 | In Woodinville, Washington, Lyft driver, Ashraf Samy-William Ibrahim, sexually assaulted his developmentally |

---

[7] https://komonews.com/news/local/police-lyft-driver-demands-sex-from-woman-drags-her-with-car-11-21-2015. Last visited September 24, 2020.

[8] https://www.sandiegouniontribune.com/news/watchdog/sdut-lyft-lawsuit-2015oct30-story.html. Last visited September 24, 2020.

[9] *Fernandez v. Lyft, Inc., et al.*, Case No. BC704418 (Super. Ct. Los Angeles County), filed May 1, 2018.

[10] https://www.dailyherald.com/article/20160922/business/309229978. Last visited September 24, 2020.

| | delayed female passenger. Ibrahim was arrested and charged. Lyft then issued a statement and deactivated Ibrahim.[11] |
|---|---|
| April 23, 2017 | A Lyft driver performed a sex act on a woman, identified as Gillian C, without her consent. The woman reported the incident to law enforcement. She filed a lawsuit in April 2019. |
| May 21, 2017 | A Lyft driver raped an unnamed woman in Detroit, Michigan. The woman filed suit in August 2019. |
| June 10, 2017 | A Lyft driver sexually assaulted a woman named Morgan Lee in San Antonio, Texas. Lee reported the incident to police. Lee filed suit against Lyft later in June 2017.[12] |
| June 18, 2017 | A Lyft driver assaulted a woman named India Matheson who reported the incident to both law enforcement officials and Lyft. The assault was captured on her video doorbell and, in September 2018, the driver was charged with "assault with sexual motivation" and subsequently convicted. Matheson filed suit in August 2019. |
| June 21, 2017 | A Lyft driver named Francisco Arias was arraigned on charges that he offered a girl under the age of 18 years old money and rides in exchange for sex in Allentown, Pennsylvania.[13] |
| July 2, 2017 | A Lyft driver sexually assaulted a woman named Sarah A. Johnson in the back seat of his vehicle in Santa Monica, California. Johnson reported the incident to both law enforcement and to Lyft. Johnson filed a lawsuit in December 2017. |
| July 4, 2017 | A Lyft driver sexually assaulted a woman named Stephanie Nan in Brooklyn, New York. Nan reported the incident to police. In August 2019, Nan filed a lawsuit. |
| July 7, 2017 | A Lyft driver with a criminal history[14] that contained charges that should have made him ineligible to drive for |

---

[11] https://www.kiro7.com/news/local/everett-lyft-driver-accused-of-sexually-assaulting-developmentally-delayed-passenger/507595372/. Last visited September 24, 2020.

[12] https://www.mysanantonio.com/business/local/article/San-Antonio-woman-sues-Lyft-accuses-driver-of-11271109.php. Last visited September 24, 2020.

[13] https://www.lehighvalleylive.com/bethlehem/2017/06/man_who_texted_minor_for_sex_f.html. Last visited September 24, 2020.

[14] In an article published on June 1, 2018, CNN reported that the third-party background company, Checkr, used by the ridesharing giants, Lyft and Uber, permitted thousands of people to drive for the companies who ought to have been ineligible due to their criminal history. Further, the article revealed that Lyft settled a lawsuit brought by the District Attorneys of San Francisco and Los Angeles, California alleging that the Company misled its customers "about the quality of [its] background checks" back in 2014.

| | |
|---|---|
| | Lyft kidnapped, bound, and raped an unnamed woman in Chicago, Illinois. The woman reported the assault to law enforcement and on July 8, 2017, the incident was reported to Lyft, who deactivated the woman's account, therefore denying her access to information related to the assailant. Thereafter, the driver was criminally charged in connection with the kidnapping and rape, as well as for a separate rape perpetrated against another victim. The woman filed a lawsuit in December 2019. |
| July 14, 2017 | A Lyft driver sexually assaulted a woman named Jennifer Hardin in the Washington, D.C. area. Hardin filed a lawsuit in August 2019. |
| July 17, 2017 | A Lyft driver sexually assaulted a woman named Danielle Lodge in Los Angeles, California. Lodge filed a lawsuit in July 2018. |
| September 16, 2017 | A Lyft driver raped his female passenger in Indianapolis, Indiana. The victim was able to record some of the assault on her cell phone and, later that month, the driver was arrested and charged with sexual battery and rape. Lyft issued a statement and deactivated the driver. |
| September 20, 2017 | The police departments in Boston and Cambridge, Massachusetts opened an investigation after a woman reported her Lyft driver sexually assaulted her. |
| October 2017 | A Lyft driver kidnapped Alison Turkos at gunpoint, drove her across state lines, and raped her together with two other men. After, Turkos reported a "kidnapping" to Lyft, and Lyft apologized for the "inconvenience" of the route alteration and charged her for the route using the intended destination. The driver continued to drive for Lyft under a new name and account. NYPD confirmed the presence of semen on Turkos's clothing and later subpoenaed Lyft as part of its investigation. The FBI later took over the investigation. Turkos filed a lawsuit in September 2019.[15] |
| October 2017 | A Lyft driver sexually assaulted a 16-year-old boy in Davie, Florida. The incident is reported and later referenced in a complaint filed against Lyft in July 2018 in connection to a separate incident of assault. |
| October 25, 2017 | Lyft's background screening service failed to discover or screen out a former al-Qaeda operative driving for Lyft who was convicted of aiding terrorism. Thereafter, Lyft deactivated the driver.[16] |

---

[15] https://medium.com/@alturkos/why-im-suing-lyft-6a409e316d1f. Last visited September 24, 2020.; https://abcnews.go.com/US/woman-kidnapped-gunpoint-raped-lyft-driver-lawsuit/story?id=65690337. Last visited September 24, 2020.

[16] https://chicagoist.com/2017/10/27/chicago_blasts_lyft_for_hiring_driv.php. Last visited

| January 3, 2018 | A Lyft driver in Tuscaloosa, Alabama assaulted an unnamed blind woman. The woman reported the incident to both law enforcement and Lyft. She joined a lawsuit filed on behalf of 14 women from multiple states in September 2019.[17] |
|---|---|
| January 11, 2018 | A Lyft driver physically, but not sexually, assaulted Kentrell Holmes, a gay man, while the driver screamed homophobic slurs. Holmes filed a lawsuit in December 2019. |
| February 3, 2018 | A Lyft driver assaulted a woman in Wilmington, North Carolina. The woman reported the incident to Lyft. The woman joined a lawsuit in September 2019. |
| February 4, 2018 | A Lyft driver physically assaulted a woman named Feda Marzouk in Cleveland, Ohio after she refused his sexual advances. Marzouk called the emergency telephone line and was then taken to a hospital. Marzouk filed a lawsuit against Lyft in November 2018. |
| February 14, 2018 | A Lyft driver physically, though not sexually, attacked a woman named Elizabeth Rahh. Rahh filed a lawsuit in February 2020. |
| March 4, 2018 | A Lyft driver assaulted and raped a woman in Marlborough, Massachusetts. The woman reported the incident to law enforcement, who then notified Lyft. The driver was then charged with rape. |
| April 8, 2018 | A Lyft driver sexually assaulted a woman while she was unconscious in Oakland, California. The incident was reported and later referenced in a complaint against Lyft in connection to a separate assault case filed in July 2018. The driver was arrested in May 2018. |
| May 2018 | A Lyft driver sexually assaulted an unnamed minor in Ontario, Canada. The assault was reported, and later referenced in a complaint filed against Lyft in connection to a separate assault case filed in July 2018. |
| May 2018 | A Lyft driver assaulted a woman in Waterford Township, Michigan after she refused his offer to pay her for sex. The assault was reported, and later referenced in a complaint filed against Lyft in connection to a separate assault case filed in July 2018. |
| May 6, 2018 | A Lyft driver sexually assaulted a woman in Cypress, California. She reported the attack to both law enforcement and to Lyft. She joined a lawsuit filed in September 2019. |

September 24, 2020.
[17] https://nypost.com/2019/09/05/lyft-is-in-the-midst-of-a-sexual-predator-crisis-riders-lawsuit/.
Last visited September 24, 2020.

| | |
|---|---|
| May 8, 2018 | A Lyft driver sexually assaulted a woman named Mary Espinosa. Espinosa filed a lawsuit in August 2019. |
| May 15, 2018 | A Lyft driver assaulted a woman in Jacksonville, North Carolina. The woman reported the incident to Lyft "immediately." She joined a lawsuit filed in September 2019. |
| June 7, 2018 | A Lyft driver, who had a long history of sexually assaulting his passengers dating back to 2013, assaulted a woman in Travis County, Texas. Thereafter, Lyft issued a public statement regarding the woman's assault and the assaults of the other passengers. The woman filed a lawsuit in September 2019. |
| June 30, 2018 | After an argument, a Lyft driver stabbed a passenger in the chest in San Diego, California. The driver was arrested. Lyft deactivated the driver. |
| July 7, 2018 | A Lyft driver raped a woman in Tacoma, Washington. The woman reported the assault to both Lyft and law enforcement. She filed a lawsuit in August 2019. |
| July 17, 2018 | A Lyft driver named Orlando Vilchez Lazo and dubbed the "Rideshare Rapist" was arraigned on four counts of rape in San Francisco, California. Lazo used Lyft's brand to pose as a driver for hire to lure women outside of bars and nightclubs into his vehicle before raping them, sometimes at knifepoint. Lyft issued a statement announcing that it had deactivated Lazo once it became aware of the allegations.[18] |
| July 2018 | A Lyft driver named Amir Sami Handouk raped a woman in Gainesville, Virginia. The driver was arrested.[19] |
| July 24, 2018 | Lyft driver sexually assaulted a woman in San Francisco, California. The woman reported the incident to police, as well as to Lyft via an "email form" immediately. The woman filed a lawsuit in September 2019. |
| August 3, 2018 | A Lyft driver raped a woman in Los Angeles. She reported the assault to the police "immediately," who then reported the incident to Lyft. The woman filed a lawsuit in June 2019. |
| August 5, 2018 | After dropping her off, a Lyft driver returned to her home and sexually assaulted a woman named Amber Wilson. Wilson filed a lawsuit in September 2019. |

[18] https://www.sfchronicle.com/crime/article/Attorney-DNA-that-solved-infamous-Rideshare-14083438.php. Last visited September 24, 2020; https://www.sfgate.com/bayarea/article/Serial-rape-suspect-posing-as-SF-ride-hailing-13073493.php. Last visited September 24, 2020.

[19] https://www.washingtonpost.com/local/public-safety/woman-allegedly-was-raped-after-using-lyft-driver-charged-police-say/2018/07/23/9ef0d804-8ecf-11e8-b769-e3fff17f0689_story.html. Last visited September 24, 2020.

| August 17, 2018 | A Lyft driver sexually assaulted a woman named Jill Berquist. Berquist reported the incident to Lyft and a Lyft representative convinced her not to file a police report "by telling [her] that LYFT would file a police report." However, Lyft failed to file a police report. Berquist filed a lawsuit in August 2019. |
|---|---|
| October 1, 2018 | A Lyft driver forced a minor and her sister to remove clothing and refused to let them out of the car. The victims filed a lawsuit in November 2019. |
| October 5, 2018 | A Lyft driver kidnapped and physically and verbally assaulted a woman named Marianne Ditrani in Hollywood, California. Ditrani reported the incident to Lyft. Ditrani filed a lawsuit in September 2019. |
| October 12, 2018 | A Lyft driver assaulted a woman named Farheen Hashem in Sun Valley, California. Hashem filed a lawsuit in September 2019. |
| October 28, 2018 | A Lyft driver assaulted a woman in Los Angeles. The woman reported the incident to law enforcement, who notified Lyft of the incident. She joined a lawsuit against Lyft filed in September 2019. |
| November 25, 2018 | A Lyft driver assaulted a woman in San Francisco, California. The woman and her friend – who was also in the vehicle at the time – video-recorded the driver's apology for the assault and reported the attack to law enforcement officials. Thereafter, the driver pled no contest to sexual battery. Lyft issued a refund to the woman for the ride. The woman joined a lawsuit filed in September 2019. |
| December 4, 2018 | A Lyft driver sexually assaulted a woman named Michelle Christensen in Oakland, California. She filed a lawsuit filed in September 2019. |
| December 7, 2018 | A Lyft driver assaulted a woman in Salt Lake City, Utah. The woman reported the attack to both Lyft and to law enforcement. The driver was ultimately charged and then convicted of misdemeanor battery. The woman joined a lawsuit filed in September 2019. |
| December 30, 2018 | A Lyft driver assaulted a woman in West Hollywood, California. The woman reported the attack to Lyft, who promised to "make sure [she] never gets paired with the driver again." She joined a lawsuit filed in September 2019. |
| January 23, 2019 | A Lyft driver raped a woman, who notified both the police and Lyft of the attack. Thereafter, the driver was charged with second-degree rape and kidnapping. The woman filed a lawsuit against Lyft filed in August 2019. |
| March 14, 2019 | A Lyft driver assaulted a woman in Charleston, South Carolina. The woman notified Lyft and then law |

| | | |
|---|---|---|
| | | enforcement about the incident. She joined a lawsuit filed in September 2019. |
| March 19, 2019 | | A Lyft driver falsely imprisoned a woman named Margarita Bicana. Bicana notified Lyft of the incident, who informed her that two other victims had also filed complaints against the assailant-driver. Bicana filed a lawsuit in August 2019. |

104.   After announcing its commitment to issuing a safety report, and that it would no longer hold victims of sexual assault to their arbitration clause for related claims in early May 2018, Uber released a "safety review" for 2017 and 2018 on December 5, 2019. Uber's safety review revealed that Uber had received "5,981 allegations of serious sexual assault in the U.S." and that approximately 3,349 of those reports involved accusations by passengers against drivers. Unfortunately, Uber's safety review also indicated that assaults were trending upwards, in the wrong direction, year-over-year.

105.   Despite the Company's image as the "safe, progressive alternative" to Uber, the Company followed suit on May 15, 2018 when it too announced that it would issue a safety report. However, to date, Lyft has failed to make good on that promise. With that said, approximately 75% of Lyft drivers also drive for Uber. Since there is such a large overlap, it is reasonable to assume that Lyft's sexual assault records are similar, or worse, than the mind-boggling figures released by Uber. Moreover, attorneys litigating sexual assault cases against both companies have reported a disparate amount of cases against Lyft.[20]

**Rider Incidents About Lyft Bikes Prior to the IPO**

---

[20] In an article published on April 30, 2018, CNN reported that "there is no publicly available data for the number of sexual assaults" by rideshare drivers. https://money.cnn.com/2018/04/30/technology/uber-driver-sexual-assault/index.html. Last visited September 25, 2020.

106.    Just prior to Lyft's acquisition, Motivate had experienced a host of issues regarding maintenance of its fleet of electronic bikes. On September 26, 2018, StreetsBlog published an article (the "StreetsBlog Article") titled "It's Not Your Imagination – Something is Seriously Wrong With Citi Bike Right Now," in which it was revealed that "[i]n the last two weeks, 21 percent of its [bikes] have simply disappeared" and that "there were only 7,166 Citi Bikes in service on Tuesday, Sept. 25 – down from 9,112 bikes two weeks earlier." The StreetsBlog Article further stated that Citi Bike was "far and away the world's worst-maintained [bike-share] system" and that "[n]o other comparable bike-share system comes even close to having 41 percent of its fleet simply unavailable."[21]

107.    Moreover, a  spokesperson for Motivate admitted that the fleet was breaking down, stating "Keeping the bike fleet in a state of good repair is a key priority for Citi Bike, and right now we have a backlog of bikes that are due for maintenance and repairs" and also that "[w]e are putting extra resources toward getting these bikes back out on the street and expect fleet levels will improve soon."

108.    On February 28, 2019, *Medium* published an article (the "Medium Article"), authored by Caroline Samponaro ("Samponaro"), Lyft's Head of Bike, Scooter, & Pedestrian Policy, titled "How Electric Bikes Are Changing the Game for Urban Mobility," in which Samponaro stated:

---

[21] On September 28, 2018, *StreetsBlog* published an article titled "De Blasio Seeks No Sanctions for Citi Bike Contract Violation," in which it detailed that the New York City would not seek nearly $1.4 million in damages the city was entitled to for violating the provision of the agreement that required Citi Bike to have "97[%] of its 12,000-bike fleet available at all times" and referred to the unavailability issue as a "repair crisis."
https://nyc.streetsblog.org/2018/09/28/de-blasio-seeks-no-sanctions-for-citi-bike-contract-violation/. Last visited September 25, 2020.

To date, we've only deployed electric bikes on a relatively small scale in select cities. That's about to change, because of the results we've seen. The early data hints at the enormous potential:

So far, we've piloted electric bikes in our bikeshare networks in the Bay Area, New York City and Washington DC area. Altogether, **riders have pedaled more than 912,000 trips on electric bikes since our pilots began.**

\*\*\*

You know Lyft as a rideshare company, so it might be surprising to hear this: we truly believe electric bikes will become a real alternative to rides in cars, and we're excited about that. Bikeshare is a natural extension of Lyft's vision to improve transportation access, sustainability and affordability. We want the members of our community to get where they are going quickly and easily, and it's very clear that electric bikes are the next great way to do that.

(Emphasis in original.)

109. On November 30, 2018, Lyft acquired Motivate, the largest bike sharing platform in the United States, for approximately $251 million. In the transition, members of Motivate's management team, including Samponaro, moved to Lyft. In doing so, although the defects existed prior to Lyft's acquisition of Motivate, Lyft was aware of the extensive issues dogging Motivate's electronic bike fleet. Moreover, pursuant to the agreements Motivate reached with the various cities their bikes were stationed in, Motivate was required to keep detailed records and reports of each complaint and accident in its systems. At the latest, upon acquisition, Lyft gained unfettered access to Motivate's record keeping systems, including their engineering and customer service records. Yet, a few months later, the Individual Defendants failed to disclose any of the issues that plagued the Company's newly acquired fleet of electronic bikes.

110. Unbeknownst to investors until after the IPO, the Company's fleet of electric bikes that it had acquired from Motivate suffered from a defect that impacted the bike's braking system, attributable to the fact that Lyft's electric bikes did not contain the required "power modulator" that Shimano, the brake manufacturer, instructed was necessary for the brakes to properly function.

Shimano's user and dealer manual states "[i]f the hub is not equipped with the power modulator, the braking force may be excessively applied." Further, in a statement, Shimano attributed blame to Lyft for the defect and explained:

> Shimano provides specification requirements for bicycle manufacturers to refer to when designing bicycles. When designed and assembled to these specifications the brakes perform to global standards. With regards to this specific case, based on the information we have, ***this is not a Shimano brake issue*** as the specification requires the use of a power modulator for this brake. ***It appears this specification was not followed by manufacturers of some of the bicycles in question***.

(Emphasis added.)

111.    According to an article published on April 26, 2019 by *Bicycling*, (the "Bicycling Article") a New York-based shop mechanic for Motivate stated the following:

> Employees were not trained to work with the electronic braking systems or e-brakes in general. As reports of crashes came in, mechanics were told to run through a series of basic maintenance tests, including torquing and re-greasing the brakes. None of these seemed to work.

> \*\*\*

> I do believe it was a fundamental lack of knowledge about what was going on.

> \*\*\*

> It seems like we were getting repairs into the shop before most mechanics knew how to work on them.

> \*\*\*

> The e-bikes seemed a bit rushed, almost like they were trying to make it out first rather than taking the time to do things right.

112.    The Bicycling Article also cited Holly Brinkman, the head of marketing for GenZe, a Bay Area company that manufactured Motivate's first line of electronic bikes for Ford GoBike. Upon Lyft's recall of many of the bike's in the fleet, as discussed in more detail herein, Brinkman declared that "its models were not part of the recall" and explained that "[w]hen Lyft acquired

Motivate, it moved GenZe's bikes to San Jose and replaced them with modified bikes taken from Motivate's existing fleet.

113.    Brinkman further explained that, "[i]n terms of expansion, it was more affordable to electrify [Lyft's] existing bikes rather than acquire new electric bikes" and that "[Lyft] essentially did a makeshift electric bike with their existing frame and model."

114.    According to an article published on April 22, 2019 by the *New York Daily News*, (the "NY Daily News Article") a Citi Bike employee "with knowledge of the e-bikes" stated "I knew this was going to occur" and that "[i]t's just one quick fix after another – these bikes are cheap."

115.    Even before the IPO, riders of Lyft's electric bikes sustained injuries and lodged complaints about the defect in the braking system. To illustrate, below is a non-exhaustive list of riders who suffered flew off Lyft's electric bikes due to the braking system defect.

| DATE | DESCRIPTION OF INCIDENT |
|---|---|
| February 2019 | Dominik Glodzik was hurled over the handlebars of the Lyft electric bike he was riding upon trying to brake for a stop sign. |
| February 19, 2019 | John Bacon flew over the handlebars of the Lyft electric bike he was riding after hitting the brake. Consequently, Bacon lost mobility in his left knee. |
| March 3, 2019 | Julie Li was hurled off the Lyft electric bike she was riding due to a hard-braking issue. As a result of the incident, Li broke her wrist. |
| March 2019 | Jordan Wyckoff flew over the handlebars of the Lyft electric bike he was riding because the front wheel locked up after he hit the brakes. |
| March 16, 2019 | Felipe Ventura was hurled over the handlebars of the Lyft electric bike he was riding after applying the brakes to avoid a collision with a pedestrian. Due to the incident, Ventura broke his left and right elbows. Lyft charged Ventura an overtime fee for failing to properly dock his bike after the accident. |

| March 17, 2019 | Bill Somers flew over the handlebars of the Lyft electric bike he was riding upon "lightly tap[ing]" the brake. Somers stated, "I literally touched [the brake] with two of my fingers and it locked up." As a result of the accident, Somers broke his hip and had to spend four days in the hospital. |
|---|---|

***Labor Disruptions Prior to the IPO***

116.    Prior to the IPO, and as a means of increase revenue and key growth metrics ahead of the IPO, Lyft began charging "surge pricing"[22] more often than it had done previously, and retaining a disproportionately higher share of the additional revenue rather than sharing a more equitable portion with its drivers. As a result, drivers were receiving less pay and, understandably, they became disincentivized to drive for Lyft and generally dissatisfied with the Company.

117.    Lyft's mistreatment of its drivers, however, did not stop there. Lyft drivers were also dissatisfied with the Company's classification of them as independent contractors. By classifying drivers as independent contractors, rather than employees, Lyft is not required to pay minimum wage, pay overtime compensation, offer paid breaks, or even reimburse drivers for the costs of driving.

118.    However, even as some Lyft drivers were demonstrating their dissatisfaction with how the Company had been treating them, the Individual Defendants failed to disclose to investors in the Offering Documents that labor disruption was a tangible, immediate, and material risk factor that would likely have an impact on the Company's business and bottom line.

***Lyft's IPO***

---

[22] Lyft refers to this as "Pricing when it's busy" and states that "[p]assengers may see higher ride costs when there's more demand for rides. If your upfront price is higher than expected, it might be busier than usual." https://help.lyft.com/hc/en-us/articles/115013080308-How-to-estimate-a-Lyft-ride-s-cost. Last visited September 25, 2020.

119.    In December 2018, the Individual Defendants began implementing steps to take the Company public. On December 12, 2018, the Company filed a draft registration statement on Form DRS with the SEC. A couple months later, on March 1, 2019, the Company filed the Registration Statement. On March 18, 2019, the Company filed an amendment to the Registration Statement on Form S-1/A with the SEC. The amendment stated that 30,770,000 shares of Class A common stock would be registered in the IPO, at a proposed maximum offering price per share of $68.00. A second amendment was filed with the SEC on March 27, 2019. The second amendment stated that 30,770,000 shares of Class A common stock would be registered in the IPO, at a proposed maximum offering price per share of $72.00. The Registration Statement was declared effective the same day, on March 28, 2019.

120.    The next day, on March 29, 2019, the Company filed the Prospectus with the SEC, and the Company's stock began trading publicly on the NASDAQ-GS that day. Subsequently, the Company sold 32.5 million shares of Class A common stock at $72 per share, including additional shares sold through options exercised by the underwriters to the IPO. Through the IPO, Lyft received aggregate net proceeds of approximately $2.34 billion, after deducting underwriter costs and expenses.

### Uber's Offering Documents Provided Appropriate Risk Factors

121.    On May 9, 2019, shortly after Lyft's IPO, Uber also went public. In connection with its IPO, Uber filed a draft registration statement on Form DRS with the SEC on December 6, 2018. Several months later, on April 11, 2019, Uber filed a registration statement on Form S-1 and a prospectus on Form 424B4 with the SEC ("Uber's Offering Documents").

122.     In stark contract to Lyft's Offering Documents, the Risk Factors section of Uber's

Offering Documents detailed specific perils for investors related to Uber drivers committing sexual

assault, stating:

> ***Maintaining and enhancing our brand and reputation is critical to our business prospects. We have previously received significant media coverage and negative publicity, particularly in 2017, regarding our brand and reputation, and failure to rehabilitate our brand and reputation will cause our business to suffer.***
>
> Maintaining and enhancing our brand and reputation is critical to our ability to attract new employees and platform users, to preserve and deepen the engagement of our existing employees and platform users, and to mitigate legislative or regulatory scrutiny, litigation, government investigations, and adverse platform user sentiment.
>
> We have previously received a high degree of negative media coverage around the world, which has adversely affected our brand and reputation and fueled distrust of our company. In 2017, the #DeleteUber campaign prompted hundreds of thousands of consumers to stop using our platform within days. Subsequently, our reputation was further harmed when an employee published a blog post alleging, among other things, that we had a toxic culture and that certain sexual harassment and discriminatory practices occurred in our workplace. Shortly thereafter, we had a number of highly publicized events and allegations, including investigations related to a software tool allegedly designed to evade and deceive authorities, a high-profile lawsuit filed against us by Waymo, and our disclosure of a data security breach. These events and the public response to such events, as well as other negative publicity we have faced in recent years, have adversely affected our brand and reputation, which makes it difficult for us to attract and retain platform users, reduces confidence in and use of our products and offerings, invites legislative and regulatory scrutiny, and results in litigation and governmental investigations. Concurrently with and after these events, our competitors raised additional capital, increased their investments in certain markets, and improved their category positions and market shares, and may continue to do so.
>
> In 2019, we plan to release a transparency report, which will provide the public with data related to reports of sexual assaults and other safety incidents claimed to have occurred on our platform in the United States. The public responses to this transparency report or similar public reporting of safety incidents claimed to have occurred on our platform, which may include disclosure of reports provided to regulators, may result in negative media coverage and increased regulatory scrutiny and could adversely affect our reputation with platform users. Further unfavorable media coverage and negative publicity could adversely impact our financial results and future prospects. As our platform continues to scale and becomes increasingly interconnected, resulting in increased media coverage and public awareness of our brand, future damage to our brand and reputation could have an amplified effect on

our various platform offerings. Additionally, following the closing of our acquisition of Careem, the Careem brand and its apps will continue to operate in parallel with our brand and apps, and any damage or reputational harm to the Careem brand could adversely impact our brand and reputation.

Our brand and reputation might also be harmed by events outside of our control. For example, we faced negative press related to suicides of taxi drivers in New York City reportedly related to the impact of ridesharing on the taxi cab industry. In addition, we have licensed our brand to Didi in China and to our Yandex. Taxi joint venture in Russia/CIS, and while we have certain contractual protections in place governing the use of our brand by these companies, we do not control these businesses, we are not able to anticipate their actions, and consumers may not be aware that these service providers are not controlled by us. Furthermore, if Drivers, restaurants, or carriers provide diminished quality of service, are involved in incidents regarding safety or privacy, engage in malfeasance, or otherwise violate the law, we may receive unfavorable press coverage and our reputation and business may be harmed. As a result, any of these third parties could take actions that result in harm to our brand, reputation, and consequently our business.

While we have taken significant steps to rehabilitate our brand and reputation, the successful rehabilitation of our brand will depend largely on maintaining a good reputation, minimizing the number of safety incidents, improving our culture and workplace practices, improving our compliance programs, maintaining a high quality of service and ethical behavior, and continuing our marketing and public relations efforts. Our brand promotion, reputation building, and media strategies have involved significant costs and may not be successful. We anticipate that other competitors and potential competitors will expand their offerings, which will make maintaining and enhancing our reputation and brand increasingly more difficult and expensive. If we fail to successfully rehabilitate our brand in the current or future competitive environment or if events similar to those that occurred in 2017 occur in the future, our brand and reputation would be further damaged and our business may suffer.

### The Individual Defendants' Duty to Disclose

123.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as Lyft, with respect to their finances and operations. Specifically, Item 303(a)(3) of Regulation S-K required Lyft to:

Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or

expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

124.    Additionally, Item 105 of Regulation S-K required the Individual Defendants to include in the "Risk Factors" section of the Offering Documents "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."

125.    As such, the Individual Defendants had a duty pursuant to Regulation S-K to disclose that (1) Lyft faced substantial liability stemming from sexual assaults that had already occurred and inadequate policies that were already in place, (2) the braking system on thousands of Lyft's electronic bikes was defective and riders sustained injuries such as scrapes, bruising, broken bones, and damaged limbs; (3) the Company had suffered a colossal first quarter net loss, totaling over $1.1 billion, more than double the net loss the Company recognized the fiscal year prior; (4) the Company planned to abandon key revenue growth metrics that the Company touted in its Offering Documents as important measurements of Lyft's financial performance and growth; and (5) the Company's market share was overstated, as these facts constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income, and (iii) significant factors that would make investing in Lyft speculative or risky.

**False and Misleading Statements**

***The Offering Documents***

126.     On March 1, 2019, before the beginning of the Relevant Period, the Company filed the Registration Statement with the SEC, in connection with the IPO. The Registration Statement was signed by Defendants Green, Zimmer, Roberts, Aggarwal, Christodoro, Horowitz, Jarrett, Lawee, Mikitani, Miura-Ko, and Wilderotter. The Company subsequently filed two amendments to the Registration Statement, and the Registration Statement was declared effective on March 28, 2019.

127.     On March 29, 2019, shortly after the Company's stock began trading on the NASDAQ-GS, the Company filed the Prospectus with the SEC, in connection with the IPO. The Prospectus formed part of and was incorporated into the Registration Statement.

128.     The Offering Documents discussed in detail the characteristics of the Company's peer-to-peer ridesharing service, touting Lyft's "[a]bility to [c]ompete [e]ffectively" due to its exalted reputation. Specifically, the Offering Documents stated:

> Although we face intense competition, ***our values, brand***, innovation and focused execution have driven increased ridesharing market share in the United States . . . . We believe we have differentiated our business from these competitors by building a multimodal TaaS network at scale while ***upholding our culture and values and creating a brand that embodies a*** commitment ***to exceptional offerings and social responsibility***, but we must continue to respond to competitive pressures.

(Emphasis added).

129.     The Offering Documents also recognized the significance of the public's perception of Lyft's brand, stating in relevant part:

> We believe that the principal competitive factors in our market include the following:
>
> - coverage and availability of access;
> - scale of network;
> - choice of modality;
> - product design;
> - ease of adoption and use;
> - features and platform experience;

- partnerships and integrations with other ecosystem participants;
- ***brand***;
- ***trust, safety, reliability and privacy***;
- customer support;
- continued innovation in new modalities;
- driver payout;
- regulatory relations; and
- prices.

(Emphasis added).

130.    Regarding Lyft's competitive advantage, the Offering Documents further provided:

> To advance our mission, we aim to build the defining brand of our generation and ***to promote a company culture based on our unique values and commitment to social responsibility***. . . . These values have given rise to a unique company culture that fosters an amazing community of drivers, riders and employees, and ***has helped establish Lyft as a widely-trusted and recognized brand. We believe many users are loyal to Lyft because of our values, brand and commitment to social responsibility.***

(Emphasis added).

131.    In describing the importance of developing a socially conscious and responsible

brand, the Offering Documents stated, in relevant part:

> ***Greater Affinity Towards Mission-Driven Brands***. Consumers, especially millennials, are gravitating towards brands that value community engagement and embrace social and environmental responsibility. 88% of millennials expect companies to produce and communicate the results of corporate social responsibility efforts, and 89% of consumers are likely to switch brands to one that is associated with a good cause, given similar price and quality.

132.    In a subsection discussing Lyft's culture, values, and authenticity, the Offering

Documents stated the following:

> ***Culture and Values.*** Our core values are Be Yourself, Uplift Others and Make it Happen. Our team members, who uphold our values and live our mission every day, are at the forefront of cultivating and spreading this culture across the drivers, riders and communities we serve. This continuous interaction across the entire Lyft community creates a virtuous cycle which further reinforces our culture and fuels our growth.

*Authentic Brand.* We believe the authenticity of our culture and values positions us to build the defining brand of our generation. Our brand embodies a commitment to exceptional offerings and social responsibility. We have built a brand that balances our mission-driven ethos with a friendly, hospitality-oriented personality. The strength of our brand is a key driver of our ability to attract and retain users and serves as a strategic differentiator. We believe that affinity for our brand will continue to strengthen as consumers increasingly gravitate towards brands that are purpose-driven and emphasize corporate social responsibility.

133.    In the main Benefits to Key Stakeholders section, the Offering Documents stated:

"***Trust and Safety. Safety is our top priority, and establishing a community built on trust and safety is paramount to our success***."[23] Moreover, the Offering Documents featured the Company's "Commitment to Trust & Safety," stating:

A strong guiding principle since day one has been to build a community that drivers and riders trust. Trust is the foundation of our relationship with drivers and riders on our platform, and we take significant measures every day that are focused on their safety. This dedication led our customer support to be recently named number one in Newsweek's 2019 America's Best Customer Service rankings for the Taxi and Peer-to-Peer Ridesharing category.

To ensure we are delivering exceptional service levels and upholding high quality standards, we have established our Customer Experience and Trust, or CET, team as a key part of our organization. With over 700 employees as of December 31, 2018, CET is in charge of fielding customer support inquiries and is available through multiple channels, including via self-service and assisted support directly within our apps. Our CET team focuses on driving results based on experience-based metrics including First Contact Resolution, which is the number of support tickets resolved during first contact with a driver or rider, and Net Promoter Score. CET aims to eliminate bad customer experiences, quickly resolve problems when they occur and maintain trust with drivers and riders. We also use third parties to help Lyft deliver best-in-class support.

The ways we promote safety include:

- *Critical Response Line.* Our Trust & Safety team, consisting of 298 employees as of December 31, 2018, is a team of specialists within CET that handle sensitive issues regarding behavior or safety incidents on our platform. Available 24/7, they work with many teams on highly visible cases to provide a high quality of care.

---

[23] Emphasis added, except italics in heading.

- ***Driving Record and Background Checks.*** Every driver is screened before they are permitted to drive on our platform, starting with professional third-party background and driving record checks. To promote a consistently high-quality experience, we ensure vehicles meet our criteria for vehicle age before drivers are accepted to drive these vehicles on our platform.

- ***Two-Way Ratings.*** Our two-way ratings system helps promote the safety and comfort of the Lyft community by offering a channel for drivers and riders to provide instant feedback on their Lyft experiences. At the end of each ride, drivers and riders are prompted to rate each other on a scale of 1-5 stars. Our ratings system allows drivers and riders to provide anonymous feedback. We take rider ratings and driver feedback very seriously. If a user is rated three stars or below, we take immediate action to understand and remediate the situation.

- ***Zero-Tolerance Policy.*** Lyft maintains a zero-tolerance drug and alcohol policy for drivers on our platform. We also do not allow riders to have open alcohol containers in-ride and can deactivate riders from the platform for violating this policy.

(Emphasis added).

134.   In the Risk Factors section, the Offering Documents stated the following, in

relevant part:

***Our reputation, brand and the network effects among the drivers and riders on our platform are important to our success, and if we are not able to continue developing our reputation, brand and network effects, our business, financial condition and results of operations could be adversely affected.***

(Emphasis added.)

135.   The Risk Factors section of the Offering Documents further maintained that the

Company:

[B]elieve[s] that building a strong reputation and brand as a safe, reliable and affordable platform and continuing to increase the strength of the network effects among the drivers and riders on our platform are critical to our ability to attract and retain qualified drivers and riders. The successful development of our reputation, brand and network effects will depend on a number of factors, many of which are outside our control. Negative perception of our platform or company may harm our reputation, brand and networks effects, including as a result of:

- ***complaints or negative publicity about us, drivers on our platform, riders***, our offerings or our policies and guidelines, even if factually incorrect or based on isolated incidents;

***

- ***a failure to operate our business in a way that is consistent with our values and mission***;
- inadequate or unsatisfactory user support service experiences;
- ***illegal or otherwise inappropriate behavior by our management team or other employees or contractors***;

(Emphasis added.)

136.   In the same Risk Factors section, the Offering Documents section also described hypothetical and vague risks associated with failing to provide maintain its company culture, stating, in relevant part:

> ***Our company culture has contributed to our success and if we cannot maintain this culture as we grow, our business could be harmed.***
> We believe that our company culture, which promotes authenticity, empathy and support for others, has been critical to our success. We face a number of challenges that may affect our ability to sustain our corporate culture, including:

***

> If we are not able to maintain our culture, our business, financial condition and results of operations could be adversely affected

(Emphasis added).

137.   The Risk Factors section listed additional theoretical risks relating to potential liability, stating the following, in relevant part:

> ***We could be subject to claims from riders, drivers or third parties that are harmed whether or not our platform is in use, which could adversely affect our business, brand, financial condition and results of operations.***
>
> We are regularly subject to claims, lawsuits, investigations and other legal proceedings relating to injuries to, or deaths of, riders, drivers or third parties that are attributed to us through our offerings. We may also be subject to claims alleging that we are directly or vicariously liable for the acts of the drivers on our platform. We may be subject to personal injury claims whether or not such injury actually occurred as a result of activity on our platform. For example, third parties have in the past asserted legal claims against us in connection with personal injuries related

to the actions of a driver or rider who may have previously utilized our platform, but was not at the time of such injury. We have incurred expenses to settle personal injury claims, which we sometimes choose to settle for reasons including expediency, protection of our reputation and to prevent the uncertainty of litigating, and we expect that such expenses will continue to increase as our business grows and we face increasing public scrutiny.

138.    Regarding Lyft's business and market share, the Offering Documents represented that:

Our values, brand, innovation and focused execution have driven significant growth in market share and in the number of users on our platform. As ridesharing becomes more mainstream, we believe that users are increasingly choosing a ridesharing platform based on brand affinity and value alignment. Our U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016. This growth comes from both new drivers and riders as well as increased ride frequency. For the quarter ended December 31, 2018, we had 18.6 million Active Riders and over 1.1 million drivers who provided rides.[24]

Our revenue was $343.3 million, $1.1 billion and $2.2 billion in 2016, 2017 and 2018, respectively, representing year-over-year growth of 209% from 2016 to 2017 and 103% from 2017 to 2018.

139.    The Offering Documents further provided with respect to the Company's "*Ability to Compete Effectively*," the following:

We operate in a competitive market and must continue to compete effectively in order to grow, improve our results of operations and achieve and maintain long-term profitability. We are one of the largest and fastest-growing multimodal transportation networks in the United States and Canada. Our main ridesharing competitors in the United States and Canada include Uber, Gett (Juno) and Via. Our main competitors in the bike and scooter sharing market include Uber (Jump), Lime and Bird. We also compete with taxi cab and livery companies, traditional automotive manufacturers and developers of autonomous vehicle technology that may compete with us in the future, including Alphabet (Waymo). Although we face intense competition, our values, brand, innovation and focused execution have driven increased ridesharing market share in the United States, growing from 22% in December 2016 to 39% in December 2018.

140.    In the "Other Key Business and Non-GAAP Metrics and Trends" section, the Offering Documents stated the following in relevant part:

*Bookings*

---

[24] "Active Riders" is defined in the Offering Documents as "all riders who take at least one ride on [the Company's] multimodal platform through the Lyft app during a quarter." Notably, for the Company's "acquired businesses, including Motivate, only riders that have taken a ride or rented a bike or scooter through [the] Lyft app during the quarter will count as an Active Rider."

> Bookings reflects the total dollar value of transportation spend that we facilitate through our platform, excluding the reductions below. W*e believe this is a key indicator* of the utility of transportation solutions provided through our multimodal platform, as well as the scale and growth in our business.
>
> *Our Bookings represents the amounts from which we earn our revenue and we expect that our revenue will grow as our Bookings grows.* Accordingly, we exclude from Bookings amounts from which we would not generate.

(Emphasis added.)

141.    Moreover, the "Other Key Business and Non-GAAP Metrics and Trends" section of the Offering Documents also featured "Revenue as a Percentage of Bookings" as a "key measure." Regarding the important metric, the Offering Statement provided, in relevant part:

> *Over the periods presented, our Revenue as a Percentage of Bookings has improved* as we have increased service fees and commissions, improved the efficiency and effectiveness of driver incentives, which reduces the amount of incentives that have the effect of decreasing revenue, and reduced market-wide price adjustment promotions offered to ridesharing riders. The growth rate in Revenue as a Percentage of Bookings increased significantly in the first and second quarters of 2017 as more riders used our platform and we experienced increased usage of our platform by riders, which enabled us to provide more earnings opportunities for drivers and generate increased service fees and commissions. The growth rate in Revenue as a Percentage of Bookings increased significantly in the second and fourth quarters of 2018 as we increased service fees and commissions in line with the industry, and had greater efficiency and effectiveness of our driver incentives, respectively. *We expect our Revenue as a Percentage of Bookings to continue to increase over time* as we improve the utilization of driver hours, increase the efficiency of driver incentives and grow revenue from our network of shared bikes and scooters and from the Select Express Drive Partner.

(Emphasis added.)

142.    According to the Company, the "Bookings" and "Revenues as a Percentage of Bookings" metrics were crucial to Lyft's analysis of the Company's growth in revenue in the years preceding the IPO. The Offering Documents specified:

> *2016 Compared to 2017*
>
> Revenue increased $716.6 million, or 209%, in the year ended December 31, 2017 compared to the prior year. *The increase was driven by a 141% increase in Bookings and a 28% increase in Revenue as a Percentage of Bookings.* The increase in Bookings was primarily related to a 131% increase in Rides, driven

primarily by an increase of between 91% and 128% in Active Riders in each of the quarters of 2017 compared to the same periods in 2016. The increase in Active Riders was primarily due to an increase in our market share, our geographic expansion and wider market adoption of ridesharing. ***Revenue as a Percentage of Bookings increased 28%, from 18% for the year ended December 31, 2016 to 23% for the year ended December 31, 2017.*** This five percentage point improvement in Revenue as a Percentage of Bookings was driven by increased service fees and commissions, which contributed approximately two percentage points, greater efficiency and effectiveness of driver incentives, which contributed approximately two percentage points, and a reduction in market-wide price adjustment promotions offered to ridesharing riders, which contributed approximately one percentage point.

*2017 Compared to 2018*

Revenue increased $1.1 billion, or 103%, in the year ended December 31, 2018 compared to the prior year. ***The increase was driven by a 76% increase in Bookings and a 17% increase in Revenue as a Percentage of Bookings.*** The increase in Bookings was primarily related to a 65% increase in Rides, driven primarily by an increase of between 47% and 74% in Active Riders in each of the quarters of 2018 compared to the same periods in 2017 The increase in Active Riders was primarily due to an increase in our market share and wider market adoption of ridesharing. ***Revenue as a Percentage of Bookings increased four percentage points from 23% for the year ended December 31, 2017 to 27% for the year ended December 31, 2018.*** This four percentage point improvement in Revenue as a Percentage of Bookings was driven by greater efficiency and effectiveness of driver incentives, which contributed approximately two percentage points, increased service fees and commissions, which contributed approximately one percentage point and revenue from the Select Express Drive Partner program, which contributed approximately one percentage point.

(Emphasis added.)

143.    The Offering Documents provided that the Company only lost approximately $683 million in the year ended December 31, 2016, $688 million in the year ended December 31, 2017, and $911 million in the year ended December 31, 2018. Although the close of the first fiscal quarter of 2019 was just three days away from the IPO, the Company's Offering Documents failed to disclose that the Company was set to post a massive $1.14 billion net loss for its first fiscal quarter as a public company, or $48.53 per share. Even after accounting for Lyft's adjusted loss and despite

beating revenue expectations, the Company still dramatically underperformed analyst expectations by posting nearly three times the amount in first quarter losses.

144.    Regarding the Company's growth and expansion, the Offering Documents represented that "[w]e are investing in the expansion of our scooter network and have expanded into shared bikes with our recent acquisition of Motivate, the largest bike sharing platform in the United States."

145.    The Offering Documents further discussed Lyft's acquisition of Motivate, stating that:

> On November 30, 2018 (the Closing Date), the Company completed its acquisition of Motivate, a New York-headquartered bikeshare company, for cash consideration of $250.9 million. The purpose of the acquisition is to establish a solid foothold in the bikeshare market and offer access to new transportation options on the Lyft Platform.

146.    The Offering Documents touted the Company's commitment to safety protocols in regards to "Lyft Bikes." The Offering Documents stated, in relevant part, ***"[w]e are committing to high safety standards for the operation of bikes*** … on our platform to best serve our riders and broader communities."[25] The Offering Documents further provided:

> *Lyft Bikes*
>
> Lyft bikes are standard and electric pedal-assist bicycles. Through our acquisition of Motivate, the largest bike sharing platform in the United States, we are well-positioned to lead sustainable mobility in the markets we serve. This platform brings expertise in managing bike share systems in partnership with cities and local governments across the country, currently operating in nine major cities across the United States. In 2017, there were more than 35 million bike share trips in the United States, of which 74% were on Motivate systems.

---

[25] Emphasis added.

147.   Moreover, the Offering Documents revealed that "[a]s part of the acquisition, the Company committed to invest $100 million in the bikesharing system for the New York metro area over the next five years" as a part of the acquisition of Motivate.

148.   The Offering Documents emphasized that Lyft was focused on being a market leader as a multimodal platform and touted that its offerings "include an expanded set of transportation modes, such as access to a network of shared bikes and scooters for shorter rides and first-mile and last-mile legs of multimodal trips," including the following graphic:



149.   The Offering Documents underscored the acquisition of Motivate and its expansion into the bikesharing market by including the acquisition in its "Several Key Milestones" achieved since Lyft's launch seven years prior to the IPO:



150.    The Offering Documents also touted the Company's competitive advantages in the

"Why Lyft Wins," stating, in relevant part:

> ***Singular Focus on Transportation.*** Transportation is not simply a massive market
> opportunity, but also an extremely complex problem demanding complete
> commitment and thoughtful execution. ***We are singularly focused on***
> ***revolutionizing transportation. This enables us to continually address the needs***
> ***of a diverse and evolving user base through innovative offerings, scale our user***
> ***network and grow our market share. We believe that this focused approach is***
> ***critical to truly leading and winning the TaaS market.***

\*\*\*

> ***Innovative Multimodal Platform.*** Our multimodal platform offers riders seamless, personalized and on-demand access to a variety of transportation options. We empower riders to select the mode of transportation best suited to their specific needs at the exact moment they need to get somewhere. Our platform enables riders to optimize their journey across a number of factors including time, cost, number of seats, service, comfort and convenience. True to our pioneering ethos, we are constantly innovating on our platform and unlocking access to new modes of transportation.

(Emphasis added.)

151.    In a section titled "The Lyft Solution," the Offering Documents further emphasized Lyft's multimodal platform and the importance of its bikes, stating, in relevant part:

> *Bikes and Scooters.* We have a network of shared bikes and scooters in a number of cities to address the needs of riders who are looking for lower-priced, more active and often more efficient options for short trips during heavy traffic. These modes can also help supplement the first mile and last mile of a multimodal trip with public transit.

152.    In discussing the Company's "Growth Strategy," the Offering Documents explained that "U.S. consumers spend over $1.2 trillion on transportation annually. [The Company is] in the very early phases of capturing this large opportunity." Further, the Offering Documents explained that the Company intended to "Increase [the Company's] Use Cases," by "extend[ing] [the Company's] offerings to make Lyft the TaaS network of choice across an expanding range of use cases," Grow Our Share of Rider Transportation Spend" by "expand[ing] [the Company's] use cases and breadth of … multimodal offerings," "Pursue M&A and Strategic Partnerships," of which Lyft used Motivate as the example, and "Expand Our Multimodal Offerings," stating:

> We continue to make Lyft an everyday experience for riders through our multimodal platform designed to address a wide range of transportation needs. By expanding our multimodal offerings, we can offer riders options that best fit their criteria directly from the Lyft app, which increases rider engagement.

153.    The Offering Documents also flaunted Lyft's "Key Benefits to Riders," stating that the Company "work[s] hard to provide [its] riders with a quality experience every time they open the Lyft app, in order to earn the right to have Lyft be their TaaS network of choice" and that "[t]he high availability of our platform and the breadth of our offerings have made us the preferred TaaS network for millions of riders."

154.    The Offering Documents further highlighted Lyft's utilization of data to improve its recently introduced network of shared bikes. The Offering Documents stated:

> ***Operating Bikes & Scooters***
> ***Beyond facilitating our ridesharing marketplace, we also utilize data-driven insights to improve our network of shared bikes and scooters***. For our Lyft Scooters offering, we use data science and real-time analytics to understand and predict rider behavior and scooter movement. This informs our on-the-ground operations teams. Our platform technology helps us pinpoint optimal scooter distribution and rebalancing, which helps reduce operational costs, maximize scooter availability and improve riders' experience.

(Emphasis added.)

155.    In the "Our Commitment to Trust & Safety" section, the Offering Documents described how Lyft "promotes safety" with respect to its network of bikes:

> ***Bikes and Scooters. Safety is a key tenet that guides our work with bikes*** and scooters. We are providing the necessary education and support for all riders and are working with partners to provide the capital and technology solutions to expand protected bike lanes and reduce speeding. We are working with organizations, like Together For Safer Roads, that collaborate with local bike and pedestrian advocates to help protect our community members. We are also giving away free helmets in select markets for our riders.

(Emphasis added, except heading.)

156.    In the main Risk Factors section, the Offering Documents disclosed hypothetical risks related to the growth of the Company's bikesharing program and that Lyft could or may be negatively impacted. Although the Offering Documents acknowledged Lyft's "business in part

depends on [its] ability to efficiently grow and further develop our network of shared bikes …
which *may* not grow as we expect or become profitable over time."[26]

157.   In regard to possible "Risk Factors," related to the Company's bikesharing
business, the Offering Documents further provided:

> ***The ridesharing market and the market for our other offerings, such as our
> network of shared bikes and scooters, are still in relatively early stages of growth
> and if such markets do not continue to grow, grow more slowly than we expect or
> fail to grow as large as we expect, our business, financial condition and results
> of operations could be adversely affected.***
>
> The ridesharing market has grown rapidly since we launched our ridesharing
> marketplace in 2012, but it is still relatively new, and it is uncertain to what extent
> market acceptance will continue to grow, if at all. In addition, ***the market for our
> other offerings, such as our network of shared bikes and scooters, is new and
> unproven, and it is uncertain whether demand for bike and scooter sharing will
> continue to grow and achieve wide market acceptance. Our success will depend
> to a substantial extent on the willingness of people to widely-adopt ridesharing
> and our other offerings. If the public does not perceive ridesharing or our other
> offerings as beneficial, or chooses not to adopt them as a result of concerns
> regarding safety, affordability or for other reasons, whether as a result of
> incidents on our platform or on our competitors' platforms or otherwise, then the
> market for our offerings may not further develop, may develop more slowly than
> we expect or may not achieve the growth potential we expect, any of which could
> adversely affect our business, financial condition and results of operations.***

(Emphasis added, except for heading.)

158.   The Offering Documents also listed as a potential risk that it could not realize
profitability "[e]ven if [the Company] is able to successfully develop and implement [its] network
of shared bikes and scooters." However, the Offering Documents presented this risk as
supposititious by declaring:

> [T]here may be heightened public skepticism of this nascent service offering. In
> particular, there could be negative public perception surrounding bike and scooter
> sharing, including the overall safety and the potential for injuries occurring as a
> result of accidents involving an increased number of bikes and scooters on the road.
> Such negative public perception may result from incidents on our platform[.]

---

[26] Emphasis added.

*** 

> Our bikes and scooters or components thereof, including bikes and scooters and components that we design and contract to manufacture using third-party suppliers, may experience quality problems or defects from time to time, which could result in decreased usage of our network of shared bikes and scooters. There can be no assurance we will be able to detect and fix all defects in our bikes and scooters. Failure to do so could result in lost revenue, litigation or regulatory challenges, including personal injury or products liability claims, and harm to our reputation.

159.    The Risk Factors section of the Offering Documents continued to couch supposed risks as hypothetical, rather than known and certain risks. The Offering Documents stated that "Our bikes … **may** experience quality problems from time to time, which could result in product recalls, injuries, litigation, enforcement actions and regulatory proceedings, and could adversely affects our business, brand, financial condition and results of operations." The Offering Documents further stated that:

> We design and contract to manufacture, and directly and indirectly modify, maintain and repair, bikes and scooters for our network of shared bikes and scooters. Such bikes and scooters may contain defects in their design, materials and construction or may be improperly maintained or repaired. These defects or improper maintenance or repair could unexpectedly interfere with the intended operations of the bikes or scooters, which could result in injuries to riders.

160.    The Offering Documents also portrayed risks, including an "adverse[] affect [on the Company's] business, brand, financial condition and results of operations" associated with "claims from riders, drivers or third parties that are harmed" as conjectural:

> As we expand our network of shared bikes and scooters, we may be subject to an increasing number of claims, lawsuits, investigations or other legal proceedings related to injuries to, or deaths of, riders of our bikes and scooters. Any such claims arising from the use of our bikes and scooters, regardless of merit or outcome, could lead to negative publicity, harm to our reputation and brand, significant legal, regulatory or financial exposure or decreased use of our bikes and scooters.

161.    Regarding Lyft's treatment of its drivers, the Offering Documents stated:

***Driver-Centric.*** We focus on providing drivers with a best-in-class experience. From day one, we offered in-app tipping to help drivers maximize earnings. Drivers have access to 24/7 support and earnings tools as well as career coaches, education resources and flexible car rental programs. We are also making significant investments in Driver Hubs, our driver-centric service centers and community spaces, to assist drivers on and off the road. We also introduced subscription offerings to encourage greater ride frequency, thereby providing more earning opportunities for drivers.

162.    The Offering Documents further provided that:

***Personalized, Data-Driven Insights.*** We have collected data from over one billion rides and over ten billion miles driven to inform our machine learning algorithms and data science engines. We leverage insights from this data to improve the product experience for riders by presenting them with personalized transportation options. Our data insights also allow us to anticipate market-specific demand, enabling us to create customized incentives for drivers in local markets. We enable riders to optimize routes across multiple modes of transportation which we believe provides us with a significant advantage over single modality providers.

163.    In a section titled "The Lyft Solution," the Offering Documents also stated:

*Ridesharing Marketplace.* Our core offering since 2012 connects drivers with riders who need to get somewhere. The scale of our network enables us to predict demand and proactively incentivize drivers to be available for rides in the right place at the right time. This allows us to optimize earning opportunities for drivers and convenience for riders, creating sustainable value to both sides of our marketplace.

164.    Regarding "Key Benefits to Drivers," the Offering Documents specified:

We work hard to serve the community of drivers on our platform, empowering them to be their own bosses and providing them the opportunity to focus their time on what matters most. Key benefits to drivers on our platform include:

- *Flexibility.* Whether someone is fully-employed or retired, having the flexibility to work when they choose can make a big difference. Drivers can sign up for Lyft easily from their device of choice. After background and safety checks are completed and their application is approved, they can start earning. Drivers can choose to get paid almost instantly with Express Pay or choose to have their earnings deposited on a weekly basis. In select cities, drivers who do not own a vehicle can get a flexible car rental with our Express Drive program in partnership with Hertz, Flexdrive and Avis Budget Group.

  - *Income.* Drivers have earned over $10 billion on our platform since inception. Our predictive technology around ride volume and demand

enables us to share key information with drivers about when and where to drive in order to maximize their earnings on a real-time basis.

- *Trust and Safety.* Safety is our top priority, and establishing a community built on trust and safety is paramount to our success. We were the first to provide up to $1 million in commercial automobile liability insurance for Transportation Network Company, or TNC, drivers from the moment they are matched with a rider until that rider is dropped off. We also provide drivers support in emergency situations and accidents. In addition, all riders using the Lyft app must provide valid payment credentials and a phone number for identification purposes prior to requesting a ride. All transactions are processed through our platform, so drivers do not need to worry about carrying cash.

- *Extensive Support.* We invest heavily in driver support and are continuously innovating to improve driver experiences. Our Driver Hubs and field locations in major cities serve as gathering places and offer in-person support and a personal connection to Lyft employees. In addition, drivers have access to 24/7 support and earnings tools, as well as career coaches, education resources and other support to meet their personal goals.

165. Regarding the Company's "Growth Strategy," the Offering Documents stated:

**Invest in Technology to Strengthen Our Network and Increase Efficiency.** Our investments in proprietary technologies and predictive analytics leverage insights derived from the rich set of data generated by our platform. These investments allow us to deliver an affordable, convenient and high-quality experience for our riders and increase the earnings of drivers. Our investments in mapping, routing, payments, in-app navigation and matching technologies are key to integrating technology and leveraging data science into our platform in order to increase the efficiency of our platform and improve safety. In addition, we are investing in autonomous technology, which we believe will be a critical part of the future of transportation.

166. Regarding "Optimizing Marketplace Supply," the Offering Documents stated:

Once drivers sign up and begin driving, our predictive analytics and dynamic pricing algorithms help us to align driver incentives to encourage drivers to be available, at the right times, in areas of high demand. This helps provide drivers with potentially higher earning opportunities by allowing them to maximize their earnings per hour, which can elevate driver satisfaction, increase supply in peak hours and improve the overall efficiency of the marketplace.

167. The statements referenced above in ¶¶ 128–166 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) passengers who were verbally and

physically assaulted, sexually harassed, and/or raped by Lyft drivers reported complaints with the Company about their experiences even prior to the IPO; (2) it was highly probable that the Company would suffer reputational damage and/or legal liability due to the rampant and increasing amount of sexual assaults committed by Lyft drivers; (3) the braking system on Lyft's electronic bikes was defective and riders sustained injuries such as scrapes, bruising, broken bones, and damaged limbs; (4) riders who were injured as a result of defect in the braking system in Lyft's electric bikes lodged complaints with the Company about their accidents even prior to the IPO; (5) safety issues related to the Company's electric bike fleet stifled Lyft's expansion, diversification, and transformation into a multimodal transportation network; (6) labor disputes with Lyft's drivers, resulting from the Company's policy changes leading up to the IPO, threatened to disrupt Lyft's workforce and significantly impact its business; (7) the Company had suffered a colossal first quarter net loss, totaling over $1.1 billion, more than double the net loss the Company recognized the fiscal year prior; (8) the Company planned to abandon key revenue growth metrics that the Company touted in its Offering Documents as important measurements of Lyft's financial performance and growth; (9) the Company's market share was overstated; and (10) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**<u>The Truth Gradually Emerges as False and Misleading Statements Continue</u>**

168.   Immediately after the IPO, on April 2, 2019, Guggenheim Partners issued an analyst report, which was featured on CNBC.com,[27] restraining its enthusiasm for Lyft shares, stating, "LYFT claims that U.S. share has ramped from 22% in 2016 to 39% in 2018. Our own

---

[27] https://www.cnbc.com/2019/04/01/guggenheim-buying-lyft-stock-requires-making-too-many-big-assumptions.html. Last visited September 25, 2020.

Google Trends analysis comparing share of search volume across top ride-hail markets puts LYFT share at 24%."

169.     On this news, the price of the Company's stock fell approximately 11.9%, or $9.28, tumbling from $78.29 per share at the close of trading on March 29, 2019 to $69.01 per share at the close of trading on April 1, 2019.

170.     Only one week after Lyft's IPO, on April 7, 2019, Gilchrist took to Twitter to reveal that she had been a victim of sexual harassment. Gilchrist shared that her Lyft driver had strangely and repeatedly inquired as to whether she had a boyfriend and, if so, whether he was home. Upon filing a report with Lyft, the Company assured her that "we'll make sure that the driver is not able to pick you up again." However, Gilchrist replied that Lyft's response was insufficient since that driver was also a threat to other Lyft passengers. Lyft pledged that the driver would be dealt with and offered her a $5 coupon for her trouble.

171.     After her tweets went viral, the *San Francisco Chronical* published an article on April 9, 2019 sharing Gilchrist's experience with her Lyft driver and covering other safety issues with Lyft's network.

172.     On this news, the price of the Company's stock fell approximately 5.67%, or $4.22, tumbling from $74.45 per share at the close of trading on April 5, 2019 to $70.23 per share at the close of trading on April 8, 2019. The Company's stock price continued to fall another 14.4% or $10.11 over the following two trading days, closing at $60.12 per share on April 10, 2019, which comprised a total three-day drop of nearly 19.25%, or $14.33 per share.

173.    On April 11, 2019, after markets closed, Uber's Offering Documents were filed with the SEC, claiming a market share of over 65% in the United States and Canada, undermining Lyft's claim that the Company controlled 39% market share.[28]

174.    On this news, the price of the Company's stock fell over 1.8%, or $1.11, dropping from $61.01 per share at the close of trading on April 11, 2019 to $59.90 per share at the close of trading on April 12, 2019.

175.    After many riders sustained serious injuries resulting from a problem with the braking system used on the electric bikes contained in Lyft's network, Lyft removed about 3,000 electric bikes from service in its bike-share program in New York, Washington D.C., and San Francisco on April 14, 2019. The move was reported by many media outlets. For example, *CNN Business* published an article on that same date (the "CNN Business Article") titled "Lyft pulls electric bicycles in DC, NY and San Francisco after reports of brake issues."

176.    On this news, the price of the Company's stock fell over 6.3%, or $3.79, dropping from $59.90 per share at the close of trading on the previous trading day, April 12, 2019 to $56.11 per share at the close of trading on April 15, 2019.

177.    Following the San Francisco Chronicle's article revealing Gilchrist's story, a swarm of news articles related to and legal actions stemming from similar harassment incidents began to surface gradually revealing the truth behind the threat Lyft's driver base posed to its most vital asset, its passengers.

---

[28] In April 2019, Credit Suisse reported, "we believe the current market share split between Lyft and Uber is about 29% versus 71% for the US," and Guggenheim Partners "conclude[d] from all of the above that LYFT's share may be overstated at 39%." HSBC also believed the market share for Lyft to be "30% market share vs. Uber's 70%."

178.    On April 22, 2019, a Lyft driver was charged for a rape that occurred in March 2019, after he had apparently restrained a passenger victim with handcuffs and groped her in January 2019. Authorities were also investigating this Lyft (and Uber) driver in connection to five other incidents of sexual assault since 2014 while driving for the Company.

179.    On May 6, 2019, the Verge Article reported that "[l]abor groups organizing the strike are protesting the companies' payment and labor practices" and that, specifically, workers are demanding "fewer driver deactivations, an end to upfront pricing, and a cap on the per-fare commission taken by ride-hail companies." The Verge Article also noted that "[t]he planned strikes appear to be more organized and geographically diverse than the protests that met Lyft's IPO in late March, which were mostly localized in California."

180.    On this news, the price of the Company's stock fell over 3.1%, or $1.94, dropping from $62.51 per share at the close of trading on the previous trading day May 3, 2019 to $60.57 per share at the close of trading on May 6, 2019.

### *May 7, 2019 Press Release & Earnings Call*

181.    On May 7, 2019, Lyft issued a press release (the "May 2019 Press Release") titled "Lyft Announces Record First Quarter Results," in which the Company announced that despite the fact that "[f]irst quarter revenue grew to 776 million, up 95% year-over-year" and "[a]ctive riders grew to over 20.5 million in the quarter," Lyft reported a net loss of $1.1 billion versus a net loss of $228.4 million in the first quarter of 2018 and an adjusted loss of $211.5 million versus an adjusted net loss of $228.4 million in the first quarter of 2018.

182.    During an earnings call held by Lyft also on May 7, 2019, in connection with the Company's first quarter financial results (the "May 2019 Earnings Call"), Defendant Zimmer highlighted the Company's "exclusive bike share operating contracts" as an example of an "area[]

of execution that [is] helping [the Company] grow fast at scale." Also on the call, Defendant Roberts reported that "2019 will be our peak loss year" leaving the public to wonder whether the Company's increasing revenue could offset the massive net loss the Company posted for the first fiscal quarter of 2019.

183.    Also on the earnings call, in response to an analyst's question regarding the absence of the "Bookings" metrics in the press release, Defendant Roberts assured investors that it was "absolutely a positive metric for [the Company] in the first quarter," but claimed that the Company was "aggressively investing in new areas including those where revenue equals bookings and so [the Company] really wanted to try to avoid investor confusion" and that the Company believes it's "more appropriate for investors to use revenue as the best top line growth metric" and "more important for investors to analyze the performance using revenue going forward."

184.    Also on May 7, 2019, *The Ringer* published an article titled "Uber and Lyft Are Going Public. Can They Keep the Public Safe?," which discussed a social media campaign raising concerns regarding the safety of Lyft, a recent study regarding Lyft drivers' history engaging in sexual assault, that "harassment and assault are issues of unknown scale on the ride-hailing platforms' because Lyft had concealed safety data, Lyft's lackluster response to reports of sexual harassment, and Lyft's failure to provide sexual harassment training to its drivers.

185.    On this news, the price of the Company's stock fell over 10.8%, or $6.43, dropping from $59.34 per share at the close of trading on May 7, 2019 to $52.91 per share at the close of trading on May 8, 2019.

186.    On May 8, 2019, *Bloomberg* reported that the Company's "shares tumbled to a record low … after the newly public ride-sharing company reported a steep quarterly loss."

187.    Also on May 8, 2019, *Barron's* published an article titled "Lyft's Gift to Investors After Its IPO? Less Information," which noted that the Company was no longer reporting its "Bookings" metric to investors.

188.    Also on May 8, 2019, the *New York Post* published an article titled "Lyft driver kidnapped female passenger, sexually assaulted her twice: cops," which detailed that a "Lyft driver in Illinois kidnapped a female passenger and sexually assaulted her twice during the hellish ordeal."

189.    On May 9, 2019, *Quartz* published an article titled "How Lyft disguises its losses," in which it blasted Lyft for using a deceptive accounting approach to insinuate that the record $114 billion loss was not as dismal as it seemed, stating "you could be forgiven for thinking Lyft's latest quarter wasn't so bad." Additionally, the article panned Lyft for omitting the "key" metrics the Company had just recently cited to in the Offering Documents:

> In its earnings report, Lyft also chose to withhold gross bookings, a measure of the total dollar value of sales made through its platform. Ride-hail companies like Uber and Lyft pay out the bulk of bookings (fares) to drivers as earnings. Figuring out how to increase the share of the fare the company keeps—called the "take rate"—while still paying enough to make the gig worthwhile for drivers is a key challenge for these companies, and one that will help determine whether they can ever become profitable.
>
> ***Lyft had highlighted gross bookings in its IPO filing and in particular its take rate***, which grew steadily throughout 2017 and 2018. ***For the company to suddenly stop sharing those figures in its first quarterly earnings report is a surprise***.

(Emphasis added.)

190.    On May 11, 2019, *MarketWatch* published an article (the "MarketWatch Article") titled "Lyft stops providing key data after IPO, then insults investors' intelligence," in which it condemned Lyft for "beg[inning] life as a public company by taking away crucial information for investors, and insultingly insisted that it was for their own good."

191.     Although during the conference call held in connection with the release of Lyft's financial results in the 1Q19 10-Q and May 2019 Press Release, Defendant Roberts insisted that bookings was "absolutely a positive metric for [the Company] in the first quarter," he also claimed that the Company was "aggressively investing in new areas including those where revenue equals bookings and so [the Company] really wanted to try to avoid investor confusion." However, the MarketWatch Article noted that:

> Lyft offered investors several different versions of profitability, including GAAP and non-GAAP net income, GAAP and non-GAAP operating income, and adjusted Ebitda, with vast differences in all those numbers. Lyft even offered an extremely nontraditional "adjusted cash" figure in supplemental materials, so that it could add in the IPO proceeds even though the company received them after the quarter was over.
>
> *Lyft did not offer any other numbers that could provide visibility into the revenue breakdown, though.*

(Emphasis added.)

### *May 14, 2019 Form 10-Q*

192.     On May 14, 2019, the Company filed the 1Q19 10-Q with the SEC. The 1Q19 10-Q was signed by Defendants Green and Roberts, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Green and Roberts attesting to the accuracy of the 1Q19 10-Q.

193.     The 1Q19 10-Q confirmed that the Company suffered a record $1.14 billion net loss or $48.53 per share, compared to a mere $911 million net loss in the year ended December 31, 2018. The 1Q19 10-Q also revealed an adjusted loss, after accounting for, among other things, stock-based compensation charges related to the IPO, the Company's first fiscal quarter net loss still came in at approximately $211 million or $9 per share, which was nearly three times more than expected losses of $3.77 per share that analysts had projected. Additionally, although the

Offering Documents—which had been filed only about two months prior—touted the growth of "key" revenue metrics such as "Bookings" and "Revenue as a Percentage of Bookings," these metrics were remarkably omitted from the Company's 1Q19 10-Q.

194.    Like the Offering Documents, the 1Q19 10-Q outlined the risks the Company *could* become subjected to if the Company is unable to maintain its "reputation, brand and network effects."

195.    Specifically, the 1Q19 10-Q stated, in relevant part:

> ***Our reputation, brand and the network effects among the drivers and riders on our platform are important to our success, and if we are not able to continue developing our reputation, brand and network effects, our business, financial condition and results of operations could be adversely affected.***
>
> We believe that building a strong reputation and brand as a safe, reliable and affordable platform and continuing to increase the strength of the network effects among the drivers and riders on our platform are critical to our ability to attract and retain qualified drivers and riders. The successful development of our reputation, brand and network effects will depend on a number of factors, many of which are outside our control. Negative perception of our platform or company may harm our reputation, brand and networks effects, including as a result of:
>
> - ***complaints or negative publicity about us, drivers on our platform, riders, our offerings or our policies and guidelines, even if factually incorrect or based on isolated incidents;***
>
> ***
>
> - ***a failure to operate our business in a way that is consistent with our values and mission;***
> - ***inadequate or unsatisfactory user support service experiences;***
> - ***illegal or otherwise inappropriate behavior by our management team or other employees or contractors;***

(Emphasis added.)

196.    The 1Q19 10-Q also detailed some of the purported safety features of Lyft's proprietary platform and outlined the risks the Company *could* become subjected to if the background checks performed on its drivers are inadequate, stating, in relevant part:

> ***We rely on third-party background check providers to screen potential drivers, and if such providers fail to provide accurate information or we do not maintain business relationships with them, our business, financial condition and results of operations could be adversely affected.***

74

We rely on third-party background check providers to screen the records of potential drivers to help identify those that are not qualified to utilize our platform pursuant to applicable law or our internal standards, and our business may be adversely affected to the extent such providers do not meet their contractual obligations, our expectations or the requirements of applicable law or regulations. If any of our third-party background check providers terminates its relationship with us or refuses to renew its agreement with us on commercially reasonable terms, we may need to find an alternate provider, and may not be able to secure similar terms or replace such partners in an acceptable timeframe. If we cannot find alternate third-party background check providers on terms acceptable to us, we may not be able to timely onboard potential drivers, and as a result, our platform may be less attractive to qualified drivers. ***Further, if the background checks conducted by our third-party background check providers do not meet our expectations or the requirements under applicable laws and regulations, unqualified drivers may be permitted to provide rides on our platform, and as a result, our reputation and brand could be adversely affected and we could be subject to increased regulatory or litigation exposure.*[29]*

We are also subject to a number of laws and regulations applicable to background checks for potential and existing drivers on our platform. For example, the California Public Utilities Commission recently updated its background check requirements, creating stricter and more robust protocols for TNC drivers. If we fail to comply with applicable laws, rules and legislation, our reputation, business, financial condition and results of operations could be adversely affected.

***Any negative publicity related to any of our third-party background check providers, including publicity related to safety incidents or data security breaches, could adversely affect our reputation and brand, and could potentially lead to increased regulatory or litigation exposure. Any of the foregoing risks could adversely affect our business, financial condition and results of operations.*[30]*

197.    Just like the Offering Documents, the 1Q19 10-Q also described hypothetical and vague risks associated with failing to maintain Lyft's company culture, stating, in relevant part:

***Our company culture has contributed to our success and if we cannot maintain this culture as we grow, our business could be harmed.***

We believe that our company culture, which promotes authenticity, empathy and support for others, has been critical to our success. We face a number of challenges that may affect our ability to sustain our corporate culture, including:

*** *

If we are not able to maintain our culture, our business, financial condition and results of operations could be adversely affected.

---

[29] Emphasis added.
[30] Emphasis added.

198.     The Risk Factors section of the 1Q19 10-Q listed additional theoretical risks relating to potential liability, similarly to the Offering Documents stated, as follows:

> ***We could be subject to claims from riders, drivers or third parties that are harmed whether or not our platform is in use, which could adversely affect our business, brand, financial condition and results of operations.***
>
> We are regularly subject to claims, lawsuits, investigations and other legal proceedings relating to injuries to, or deaths of, riders, drivers or third parties that are attributed to us through our offerings. We may also be subject to claims alleging that we are directly or vicariously liable for the acts of the drivers on our platform. We may be subject to personal injury claims whether or not such injury actually occurred as a result of activity on our platform. For example, third parties have in the past asserted legal claims against us in connection with personal injuries related to the actions of a driver or rider who may have previously utilized our platform, but was not at the time of such injury. We have incurred expenses to settle personal injury claims, which we sometimes choose to settle for reasons including expediency, protection of our reputation and to prevent the uncertainty of litigating, and we expect that such expenses will continue to increase as our business grows and we face increasing public scrutiny.

(Emphasis added.)

199.     In the Legal Proceedings section of the 1Q19 10-Q, regarding "Personal Injury Matters" the Company stated:

> ***There is no pending or threatened legal proceeding that has arisen from these accidents or incidents that individually, in our opinion, is likely to have a material impact on our business, financial condition or results of operations***; however, results of litigation and claims are inherently unpredictable and legal proceedings related to such accidents or incidents, in the aggregate, could have a material impact on our business, financial condition and results of operations. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs individually and in the aggregate, diversion of management resources and other factors. There have been no material changes with respect to these matters as disclosed in our Prospectus.

(Emphasis added.)

200.     Regarding Lyft's business and market share, the 1Q19 10-Q stated that "[w]e face intense competition and could lose market share to our competitors, which could adversely affect our business, financial condition and results of operations."

201.     Regarding the Company's growth and expansion, the 1Q19 10-Q represented, in relevant part, that:

We are continuing to invest in the future, both organically and through acquisitions of complementary businesses. We are investing in the expansion of our scooter network and have expanded into shared bikes with our recent acquisition of Bikeshare Holdings LLC, or Motivate.

202.    The 1Q19 10-Q further discussed Lyft's acquisition of Motivate, stating that:

**If we are unable to successfully manage the complexities associated with our expanding multimodal platform, our business, financial condition and results of operations could be adversely affected.**

Our expansion into bike and scooter sharing and other modes of transportation has increased the complexity of our business. These new offerings have required us to develop new expertise and marketing and operational strategies, and have subjected us to new laws, regulations and risks. For example, we face the risk that our network of shared bikes and scooters, our Nearby Transit offering, which integrates third-party public transit data into the Lyft App, and other future transportation offerings could reduce the use of our ridesharing offering. If we are unable to successfully manage the complexities associated with our expanding multimodal platform, including the effects our new and evolving offerings have on our existing business, our business, financial condition and results of operations could be adversely affected.

203.    The Risk Factors section of the 1Q19 10-Q stated that safety issues *could* adversely

affect the Company's business operations and growth, as follows:

**The ridesharing market and the market for our other offerings, such as our network of shared bikes and scooters, are still in relatively early stages of growth and if such markets do not continue to grow, grow more slowly than we expect or fail to grow as large as we expect, our business, financial condition and results of operations could be adversely affected.**

The ridesharing market has grown rapidly since we launched our ridesharing marketplace in 2012, but it is still relatively new, and it is uncertain to what extent market acceptance will continue to grow, if at all. ***In addition, the market for our other offerings, such as our network of shared bikes and scooters, is new and unproven, and it is uncertain whether demand for bike and scooter sharing will continue to grow and achieve wide market acceptance. Our success will depend to a substantial extent on the willingness of people to widely-adopt ridesharing and our other offerings. If the public does not perceive ridesharing or our other offerings as beneficial, or chooses not to adopt them as a result of concerns regarding safety, affordability or for other reasons, whether as a result of incidents on our platform or on our competitors' platforms or otherwise, then the market for our offerings may not further develop, may develop more slowly than we expect or may not achieve the growth potential we expect, any of which could adversely affect our business, financial condition and results of operations***.

(Emphasis added, except for heading.)

204.    Similarly to the Offering Documents, the 1Q19 10-Q also listed the following as a potential, theoretical risk:

> ***If we are unable to efficiently grow and further develop our network of shared bikes and scooters, which may not grow as we expect or become profitable over time, and manage the related risks, our business, financial condition and results of operations could be adversely affected.***
>
> ***
>
> [T]here may be heightened public skepticism of this nascent service offering. In particular, there could be negative public perception surrounding bike and scooter sharing, including the overall safety and the potential for injuries occurring as a result of accidents involving an increased number of bikes and scooters on the road. Such negative public perception may result from incidents on our platform[.]
>
> ***
>
> Our bikes and scooters or components thereof, including bikes and scooters and components that we design and contract to manufacture using third-party suppliers, may experience quality problems or defects from time to time, which could result in decreased usage of our network of shared bikes and scooters. There can be no assurance we will be able to detect and fix all defects in our bikes and scooters. Failure to do so could result in lost revenue, litigation or regulatory challenges, including personal injury or products liability claims, and harm to our reputation.

205.    The Risk Factors section of the 1Q19 10-Q continued to couch supposed risks as hypothetical, rather than known and certain risks. The 1Q19 10-Q stated that "Our bikes … may experience quality problems from time to time, which could result in product recalls, injuries, litigation, enforcement actions and regulatory proceedings, and could adversely affect our business, brand, financial condition and results of operations." The 1Q19 10-Q further stated that:

> We design and contract to manufacture, and directly and indirectly modify, maintain and repair, bikes and scooters for our network of shared bikes and scooters. Such bikes and scooters may contain defects in their design, materials and construction or may be improperly maintained or repaired. These defects or improper maintenance or repair could unexpectedly interfere with the intended operations of the bikes or scooters, which could result in injuries to riders.

206.    The 1Q19 10-Q also portrayed risks, including an "adverse[] affect [on the Company's] business, brand, financial condition and results of operations" associated with "claims from riders, drivers or third parties that are harmed" as conjectural, stating the following:

> As we expand our network of shared bikes and scooters, we may be subject to an increasing number of claims, lawsuits, investigations or other legal proceedings related to injuries to, or deaths of, riders of our bikes and scooters. Any such claims arising from the use of our bikes and scooters, regardless of merit or outcome, could lead to negative publicity, harm to our reputation and brand, significant legal, regulatory or financial exposure or decreased use of our bikes and scooters.

207.    Lastly, the 1Q19 10-Q provided that "[*i*]*f we fail to cost-effectively attract and retain qualified drivers, or to increase utilization of our platform by existing drivers, our business, financial condition and results of operations could be harmed.* However, the 1Q19 10-Q continued to couch risks such as "strikes or other work stoppages" as potential risks "that *could*[31] adversely affect our users and our business."

208.    The statements referenced above in ¶¶ 181–183 and 192–207 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) passengers who were verbally and physically assaulted, sexually harassed, and/or raped by Lyft drivers reported complaints with the Company about their experiences even prior to the IPO; (2) it was highly probable that the Company would suffer reputational damage and/or legal liability due to the rampant and increasing amount of sexual assaults committed by Lyft drivers; (3) the braking system on Lyft's electronic bikes was defective and riders sustained injuries such as scrapes, bruising, broken bones, and damaged limbs; (4) riders who were injured as a result of defect in the braking system in Lyft's electric bikes lodged complaints with the Company about their accidents even prior to the IPO; (5) safety issues related to the Company's electric bike fleet stifled Lyft's expansion, diversification,

---

[31] Emphasis added.

and transformation into a multimodal transportation network; (6) labor disputes with Lyft's drivers, resulting from the Company's policy changes leading up to the IPO, threatened to disrupt Lyft's workforce and significantly impact its business; (7) the Company's market share was overstated; and (8) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

209.    On May 14, 2019, *The Wall Street Journal* published an article titled "Uber and Lyft Get Creative With Numbers, but Investors Aren't Blind to the Losses," in which it decried Lyft's usage of misleading accounting methods, stating:

> The creative accounting is reminiscent of the late 1990s dot-com bubble, when money-losing companies went public touting "pro forma" profit as a better measure of financial performance.

210.    On July 4, 2019, the *Cincinnati Enquirer* published an article titled "NKY man accused of sex abuse of a juvenile kept Lyft job for months," which reported that a "Northern Kentucky man who was indicted on sexual abuse of a juvenile charges remained a Lyft driver for months after the allegations against him became public."

211.    Also on July 4, 2019, the *San Mateo Daily Journal* published an article titled "Man Caught Exposing Self to Teens," which reported that a 29-year old Lyft driver had been jailed on accusations he exposed himself to five preteen and teenage girls in four separate incidents in Daly City and Millbrae California between March 2019 and May 2019.

212.    On this news, the price of the Company's stock declined from $60.60 per share at the close of trading on July 3, 2019, to $59.39 per share at the close of trading on July 5, 2019, the next trading day.

213.    After markets closed on July 26, 2019, *San Luis Obispo Tribune* published an article titled "Nipomo woman files 2nd Lyft lawsuit for alleged sexual assault – and others join

her," which detailed the allegations of a class action lawsuit against the Company that Lyft "breached" its duty of care in the "supervision of and/or retention of its drivers."

214.    On this news, the price of the Company's stock declined from $65.52 per share at the close of trading on July 26, 2019, to $64.03 per share at the close of trading on July 29, 2019, the next trading day.

215.    On July 31, 2019, *TechCrunch* published an article titled "Lyft pulls e-bikes in light of apparent battery fires," which reported that Lyft was recalling e-bikes as a result of two catching fire.

216.    On August 1, 2019, the Company was hit with a lawsuit by seven different women alleging they were raped or assaulted as passengers during their Lyft rides by their Lyft drivers. The victims also made it clear that they were in fact, charged for those rides despite reporting those attacks. Also on August 1, 2019, the *New Times SLO* published an article titled "Lyft sued for not keeping passengers safe," which reported the news of the recent litigation against Lyft.

217.    On August 2, 2019, the *Washington Post* published an article titled "How Lyft lost the trust of #DeleteUber women who thought it was 'woke,'" in which it detailed how "Lyft markets itself as a safe, progressive alternative" and how "Lyft has risen to prominence – including raising billions of dollars by going public this year – in large part by touting a 'woke' image. ... drawing a contrast with rival Uber, which lost waves of customers after accusations of fostering a "tech bro" culture that enabled misconduct." However, in realty, the article states that "Lyft's reputation [has been] increasingly under fire from women who say the company often falls short when faced with allegations of sexual harassment by drivers."

218.    On August 21, 2019, Vice News published an article titled "Lyft Has Been Flooded With Sexual Assault Lawsuits," in which it reported that "[s]ome advocates have noted that Lyft's

app, which requires users navigate a labyrinthine process to file a complaint, is less user-friendly than Uber's, which requires a single click."

219.   Also on August 21, 2019, *The Daily Dot* published an article titled "Lyft received a whopping 7 sexual assault lawsuits in a day," which reported lawsuits related to sexual allegations assert that Lyft's management "failed to implement the most obvious and straightforward safety procedures in order to address the growing problem of sexual assault."

220.   On this news, the price of the Company's stock declined from $54.15 per share at the close of trading on August 21, 2019, to $51.36 per share at the close of trading on August 22, 2019.

221.   On August 23, 2019, *Bicycling* published an article titled "Why do E-Bikes Catch Fire?," which covered safety issues regarding Lyft bikes catching on fire.

222.   On August 28, 2019, Omaha World-Herald published an article titled "Lyft driver in Omaha threatened to kill female passenger," reported that a Lyft driver had been charged with threatening to kill a female passenger after attempting to follow her inside of her home.

223.   On September 4, 2019, fourteen female passenger-victims filed suit against Lyft for mishandling their complaints of assault, sexual harassment, and rape by the Company's drivers. In their lawsuit, the woman asserted that Lyft "stone-wall[ed]" law enforcement officials, failed to adequately investigate and select drivers, and attempted to talk down the major problem it faced regarding the Company's drivers perpetrating sexual assault against Lyft female passengers. Further, the women claimed that "many of the assault victims have been told by detectives handling their case that Lyft's Trust and Safety team are often unresponsive to the detectives' request."

224.    On September 5, 2019, *Law360* published an article titled "Lyft Is Hiding 'Sexual Predator Crisis,' Passengers Say," which covered the allegations contained in the recently filed lawsuits.

225.    On September 6, 2019, *FindLaw* published an article titled "Lyft Facing Another Massive Sexual Assault Lawsuit," and *Seeking Alpha* published an article titled "Lyft stock turns cheaper amid complaints of misbehavior" which also covered the allegations contained in the recently filed lawsuits.

226.    On these disclosures, the price of the Company's stock declined over the course of the next two trading days from $46.35 per share at the close of trading on September 4, 2019, to $44.50 per share at the close of trading on September 6, 2019.

227.    On September 17, 2019, five more woman took legal action against Lyft, alleging in their suits that they had been sexually assaulted by their Lyft drivers and that the Company failed to adequately screen and perform diligent background checks on its drivers. The next day, on September 18, 2019, *CNN*, published an article titled, "Lyft hit by five more alleged sexual assault, rape cases in one day" reporting on the allegations.

228.    On September 29, 2019, The Register-Guard published an article titled "Lyft driver checks miss convicted murderer, sex offender," which reported that Lyft driver background checks failed to turn up serious criminal histories of its driver candidates.

229.    In September 2019, a class action complaint was filed against Lyft alleging, among other things, that Lyft does not report rape and sexual assault to police officials despite knowing "that adopting a policy of mandatory reporting [of rape and sexual assault] will help prevent future assaults and increase passenger safety."

230.     On October 1, 2019, HuffPost published an article titled "Sen. Richard Blumenthal Demands Answers From Uber, Lyft Over Sexual Assault Allegations, which reported that Senator Richard Blumenthal of Connecticut condemned Lyft for "telling employees to dissuade victims from notifying authorities."

231.     On this news, the price of the Company's stock declined from $39.57 per share at the close of trading on October 1, 2019, to $38.39 per share at the close of trading on October 1, 2019.

232.     On January 6, 2020, *USA Today* published an article titled "The anti-Uber? Lyft's track record on safety, sexual assaults lawsuits undercuts 'good guy' image," in which it reported on a lawsuit filed in December 2018 by nineteen women against Lyft and remarked that "lawsuits are chipping away at the image of corporate responsibility that Lyft carefully cultivated as its larger rival, Uber, slogged through scandals in recent years." The article also stated "[s]ome attorneys who represent survivors of sexual assaults that happened in both Lyft and Uber vehicles suspect safety problems at Lyft may be worse than at Uber, based on the number of cases they have, the companies' relative size and the severity of the incidents."

233.     The Company's stock price continued to dwindle over the course of the year. As of the filing of this complaint, the Company's stock trades as low as $27.00 per share.

## DAMAGES TO LYFT

234.     As a direct and proximate result of the Individual Defendants' conduct, Lyft will lose and expend many millions of dollars.

235.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and the Individual Defendants, and any internal

investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

236.   Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to certain of the Individual Defendants who breached their fiduciary duties to the Company.

237.   As a direct and proximate result of the Individual Defendants' conduct, Lyft has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

238.   Plaintiff brings this action derivatively and for the benefit of Lyft to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Lyft, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

239.   Lyft is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

240.   Plaintiff is, and has been at all relevant times, a shareholder of Lyft.  Plaintiff will adequately and fairly represent the interests of Lyft in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

241.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

242.    A pre-suit demand on the Board of Lyft is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following seven individuals: Defendants Green, Zimmer, Aggarwal, Jarrett, Lawee, Miura-Ko, and Wilderotter (the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven directors who are on the Board at the time this action is commenced.

243.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

244.    Each of the Directors served as Company directors prior to and throughout the Relevant Period and at the time of the IPO. In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

245.    Additional reasons that demand on Defendant Green is futile follow. Defendant Green is the co-founder of the Company, and has served as the Company's CEO and as a Company

director since the Company's founding in 2007. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Green with his principal occupation, and he receives handsome compensation, including $801,564 during fiscal 2019. Defendant Green was ultimately responsible for all of the false and misleading statements and omissions that were made, including, but not limited to, those contained in the Offering Documents, May 2019 Press Release, during the May 2019 Earnings Call, and in the Company's recent filings with the SEC, including the 1Q19 10-Q, which he signed. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Green is a defendant in the Securities Class Actions. For these reasons, too, Defendant Green breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

246.     Additional reasons that demand on Defendant Zimmer is futile follow. Defendant Zimmer is the co-founder of the Company, and has served as the Company's President since March 2013, as the Company's Vice Chairman since January 2019, and as a Company director since June 2010. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Zimmer with his principal occupation, and he receives handsome compensation, including $2,012,450 during fiscal 2019. Defendant Zimmer was ultimately responsible for all of the false and misleading statements and omissions that were made, including, but not limited to, those contained in the Offering Documents, May 2019 Press Release, and during the May 2019 Earnings Call. As one of the Company's highest officers and as a trusted Company director, he

conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Zimmer is a defendant in the Securities Class Actions. For these reasons, too, Defendant Zimmer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

247.    Additional reasons that demand on Defendant Aggarwal is futile follow.  Defendant Aggarwal has served as the Chairman of the Board since January 2019 and as a Company director since February 2016. He also serves as a member of the Audit Committee and Compensation Committee. Defendant Aggarwal has received and continues to receive handsome compensation for his role as a director as described herein. As a long-time trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Aggarwal signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Aggarwal is a defendant in the Securities Class Actions. For these reasons, Defendant Aggarwal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

248.    Additional reasons that demand on Defendant Jarrett is futile follow. Defendant Jarrett has served as a Company director since July 2017. She also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Jarrett has received and continues to receive handsome compensation for her role as a director as described

herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Jarrett signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Jarrett is a defendant in the Securities Class Actions. For these reasons, Defendant Jarrett breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

249.    Additional reasons that demand on Defendant Lawee is futile follow. Defendant Lawee has served as a Company director since November 2017. He also serves as the Chairperson of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. Defendant Lawee has received and continues to receive handsome compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Lawee signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Lawee is a defendant in the Securities Class Actions. For these reasons, Defendant Lawee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

250.     Additional reasons that demand on Defendant Miura-Ko is futile follow. Defendant Miura-Ko has served as a Company director since June 2016 and previously served as a Company director from June 2010 to May 2013. She also serves as the Chairperson of the Nominating and Corporate Governance Committee. Defendant Miura-Ko has received and continues to receive handsome compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Miura-Ko signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Miura-Ko is a defendant in the Securities Class Actions. For these reasons, Defendant Miura-Ko breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

251.     Additional reasons that demand on Defendant Wilderotter is futile follow. Defendant Wilderotter has served as a Company director since May 2018. She also serves as the Chairperson of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Wilderotter signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Wilderotter is a defendant in the Securities Class Actions. For these reasons, Defendant Wilderotter breached her

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

252.    Additional reasons that demand on the Board is futile follow.

253.    Defendants Aggarwal, Jarret, and Wilderotter (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes and internal controls, the integrity of the Company's financial statements, the Company's compliance with applicable laws, and the Company's risk assessment and risk management policies relating to financial and accounting matters. The Audit Committee Defendants were also responsible for reviewing and discussing with management the Company's disclosures in its periodic reports with the SEC and earnings press releases. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

254.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, and all of whom are defendants in the Securities Class Actions, have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, four of the seven Directors have served on the Board for four years or more. These conflicts of interest precluded the Directors from adequately monitoring the

Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

255.    Defendants Green and Zimmer co-founded the Company, and have worked closely together for over a decade to build Lyft, develop its features, and grow its user base. Because of these long-time personal and professional connections, and in light of the substantial likelihood of liability that each of them faces in the Securities Class Actions, neither of these two Directors can evaluate a demand with disinterest or independence. Thus, demand is excused as to them.

256.    Demand is excused in this case because the Directors are beholden to and controlled by Defendants Green and Zimmer, who control the Company by virtue of their collective beneficial share ownership, which provided them with approximately 37.47% of total shareholder voting power as of March 31, 2020. These shareholdings provide Defendants Green and Zimmer with significant control over the continued employment of the remaining Directors. The Directors are beholden to Defendants Green and Zimmer because of the Directors' lavish compensation, which is akin to that received by executive officers at large publicly traded companies. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendants Green's and Zimmer's substantial likelihood of liability in the Securities Class Actions and in the present action, and accordingly, demand is excused as to them.

257.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to make and cause the Company to make, and to fail to correct, materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Directors failed to comply with laws and

regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

258.    Lyft has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Lyft any part of the damages Lyft suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

259.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's bylaws. As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

260.    The acts complained of herein constitute violations of fiduciary duties owed by Lyft's officers and directors, and these acts are incapable of ratification.

261.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Lyft.  If there is a directors' and officers' liability

insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Lyft, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

262.    If there is no directors' and officers' liability insurance, then the Directors will not cause Lyft to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

263.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants Breach of Fiduciary Duties

264.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

265.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lyft's business and affairs.

266.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

267.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Lyft.

268.     In breach of their fiduciary duties owed to Lyft, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact that failed to disclose, *inter alia*, that: (1) passengers who were verbally and physically assaulted, sexually harassed, and/or raped by Lyft drivers reported complaints with the Company about their experiences even prior to the IPO; (2) it was highly probable that the Company would suffer reputational damage and/or legal liability due to the rampant and increasing amount of sexual assaults committed by Lyft drivers; (3) the braking system on Lyft's electronic bikes was defective and riders sustained injuries such as scrapes, bruising, broken bones, and damaged limbs; (4) riders who were injured as a result of defect in the braking system in Lyft's electric bikes lodged complaints with the Company about their accidents even prior to the IPO; (5) safety issues related to the Company's electric bike fleet stifled Lyft's expansion, diversification, and transformation into a multimodal transportation network; (6) labor disputes with Lyft's drivers, resulting from the Company's policy changes leading up to the IPO, threatened to disrupt Lyft's workforce and significantly impact its business; (7) the Company had suffered a colossal first quarter net loss, totaling over $1.1 billion, more than double the net loss the Company recognized the fiscal year prior; (8) the Company planned to abandon key revenue growth metrics that the Company touted in its Offering Documents as important measurements of Lyft's financial performance and growth; (9) the Company's market share was overstated; and (10) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

269.    The Individual Defendants further failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact.

270.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

271.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Lyft's securities.

272.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Lyft's securities.

273.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

274.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lyft has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

275.    Plaintiff on behalf of Lyft has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

276.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

277.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lyft.

278.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Lyft that was tied to the performance or artificially inflated valuation of Lyft, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

279.    Plaintiff, as a shareholder and a representative of Lyft, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

280.    Plaintiff on behalf of Lyft has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

281.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

282.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Lyft, for which they are legally responsible.

283.    As a direct and proximate result of the Individual Defendants' abuse of control, Lyft has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Lyft has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

284.    Plaintiff on behalf of Lyft has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

285.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

286.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Lyft in a manner consistent with the operations of a publicly-held corporation.

287.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lyft has sustained and will continue to sustain significant damages.

288.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

289.    Plaintiff on behalf of Lyft has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

290.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

291.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Lyft to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions and to lose financing from investors and business from future customers who no longer trust the Company and its products.

292.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

293.    Plaintiff on behalf of Lyft has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Contribution
### Under Section 11(f) of the Securities Act and Section 21D of the Exchange Act

294.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

295.    As a result of the conduct and events alleged herein, the Company has been named as a defendant in the Securities Class Actions brought on behalf of Lyft shareholders in which the Company is a joint tortfeasor in claims brought under Sections 11, 12(a)(2), and 15 of the Securities Act.

296.    Federal law provides Lyft with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

297.    The plaintiffs in the Securities Class Actions allege that the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

298.    Lyft is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

299.    As issuer of the shares, Lyft is strictly liable to plaintiffs and the class for the misstatements and omissions alleged in the Securities Class Actions.

300.    The plaintiffs in the Securities Class Actions allege that none of the Individual Defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

301.    The Individual Defendants, because of their positions of control and authority as officers and directors of Lyft, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Lyft, including the wrongful acts complained of herein and in the Securities Class Actions.

302.    Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

303.     As such, Lyft is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Lyft, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Lyft;

(c)     Determining and awarding to Lyft the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Lyft and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lyft and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Lyft to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

(e)     Awarding Lyft restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: September 30, 2020                        Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com